IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 10-CR-00317-REB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.    RICHARD KELLOGG ARMSTRONG,

    Defendant.

---

## DECLARATION

---

I, GREG M. FLYNN, hereby declare as follows:

1.    I am a Special Agent/Criminal Investigator with the Internal Revenue Service Criminal Investigation Division (IRS/CID). I have been employed as such since July of 1999, and have worked in the Denver Field Office since January of 2000. I am also the case agent for IRS/CID responsible for the investigation of the matters that led to the indictment of defendant Richard Kellogg Armstrong and co-defendant Morris in this case.

2.    On June 21, 2010, I testified as a witness for the government, in connection with a re-opened detention hearing concerning defendant Armstrong. I submit this declaration, as a supplement to my testimony, to present additional evidence bearing on the issues that have been raised concerning defendant Armstrong's detention, and specifically to address certain factual contentions made in the defendant's Motion to Reconsider Magistrate's Order of Detention (Docket Entry No. 43).

3.    In his motion, the defendant contends that tape recorded conversations between

him and his spouse indicate that the defendant does not have vast financial resources at his disposal and appears to be cash-strapped. The recorded calls referenced by the motion appear to be a set of recorded conversations between the defendant and his spouse while he was in pretrial custody in this case at the Imperial County, California Jail. I obtained digital copies of these recorded calls and the digital copies were made available to the defense as part of the government's pretrial disclosures in this case to date. I have listened to all of the tape recorded calls at this facility, which span from May 30, 2010, approximately ten days after the defendant's arrest in Imperial County on this case, through June 7, 2010.[1]

4.  The substance of these recorded calls, when seen together with the evidence that I have developed in the investigation of this case to date, is not, in my view, consistent with the characterization of the defendant's financial condition set forth in the defendant's motion; in fact, tends to undermine the contention that the defendant lacks substantial financial assets; and instead is consistent with the financial analysis that I conducted of the defendant's available bank records showing that the defendant has placed a large amount of funds outside the United States.

5.  As I indicated in my testimony at the June 21, 2010 detention hearing, on or about December 15, 2008, three United States Treasury checks totaling approximately $1.6 million were deposited into an account that the defendant and his spouse maintained in Arizona with Bank of America. The checks corresponded to payments of income tax refunds and accrued interest resulting from amended income tax returns that were filed for the defendant and his spouse for the years 2005 through 2007 and which are the subject of counts in the indictment pending in this case. Using available bank account records, I attempted to trace these deposited

---

[1] I was advised by officials at the jail that any calls between the defendant and others at the jail that pre-date May 30 were no longer maintained at the time of my request.

funds and was able to determine that roughly $947,000 was used for transactions in the United States, including the purchase of real estate in Arizona and Colorado. I traced an additional $395,500 of these funds to entities that appeared to be based outside of the United States, including approximately $351,000 to the Caye International Bank in Belize for the apparent benefit of an entity identified as "Redwood Resources, Ltd.", and approximately $44,500 to an entity identified as "Admiral Global."

6. Although I was unable to follow the further course of these funds, because the transaction records were with foreign banks, I noted that two of the foreign banks in question – Caye International and Provident Bank and Trust in Belize – appeared to be banks from which the defendant and his spouse received significant wire transfers to domestic bank accounts both pre-dating and post-dating the receipt and deposit of the three United States Treasury checks. I observed, in this regard, that over the course of 2007 and 2008 the defendant and his spouse received in excess of $100,000 from accounts in the name of "Blackstone Pension" at various banks, including the Provident Bank and Trust of Belize, and that, between October 2008 and July 2009, the defendant and his spouse received in excess of $50,000 from accounts in the names of various entities at Caye International Bank in Belize.

7. To date, I have not been able to fully account for roughly $690,000 of the IRS refund proceeds deposited to the domestic account of the defendant and his spouse in December 2008, a figure which includes the funds sent outside the United States.

8. The recorded calls between the defendant and his spouse while the defendant was housed at the Imperial County Jail appear to reference the funds that were placed offshore. During the recorded conversations, Mrs. Armstrong told the defendant, in words or substance, that "they know about Belize" and the defendant replied that he did not care if they knew about

it or not because "they can't do a fucking thing about Belize." While the recorded conversations include numerous discussions about Mrs. Armstrong not having cash in bank accounts and not having credit available on credit cards, the conversations take place amidst discussions about Mrs. Armstrong's apparent lack of access to funds in Belize. In this particular regard, during one of the recorded calls, Mrs. Armstrong expressed concern that she did not know how to do anything with" it," appearing to refer to funds in Belize, to which the defendant responded that he would instruct her on how to request a loan.[2] The defendant told his spouse, in specific, that, in order for to get money, he would tell her how to go about requesting a loan from the "Canton Foundation," one of the account names used to send money to the defendant and his spouse in the United States from Caye Bank in Belize. The defendant, at one point, identified Caye Bank by name in the conversations.

9. An additional reference in the recorded calls between the defendant and his spouse concerning offshore funds included discussion about a contemplated refund of $20,000 that was being held at a real estate title company. In this particular regard, the defendant indicated that the money could not be returned to its source, because the source was offshore, and indicated that other arrangements for the return of the money would need to be made. Other recorded conversation reflects that the defendant may continue to have access to funds not yet identified by the government, the defendant, in this connection, making repeated references to "FE," an apparent reference to "Foreign Enterprises," and how "they" have not hit "FE" yet.

10. Further, the recorded conversation, although addressing need for cash, reflect that the defendant and his spouse were leading a comfortable lifestyle at the time of the defendant's

---

[2] At another point in the recorded conversations, Mrs. Armstrong reiterated this point, indicating that she had nothing to with the banking and that the defendant had handled all of the couple's banking.

arrest. During the conversations, the couple discuss paying rent for two airplane hangars in Arizona, and paying for the services of a gardener and a pool maintenance person.

11. Overall the couples' discussions about their finances in these recorded calls, together with the activity observed in their domestic bank accounts, is consistent with someone holding undisclosed funds offshore. With these schemes, tax evaders, and others wishing to conceal their assets, place funds offshore, and then sometimes repatriate the money using payments characterized as loans to avert suspicion. Payments characterized as loans would not appear taxable to the borrower, and would conceal the fact that someone has an account offshore. In these situations the foreign account holder may appear to be cash poor, when in fact they have significant funds at their disposal in other countries. Additionally, people engaging in these types of activities will typically limit their exposure to adverse actions in the U.S. by leaving most of their funds offshore, and beyond the reach of the IRS or U.S. Courts. These individuals will typically repatriate small amounts of funds only when needed.

12. Since the June 21st detention hearing, I have also done additional investigation concerning the nature and character of the ties of the defendant and his spouse to Cabo San Lucas, Mexico. I identified and spoke with John Schmidbauer, a neighbor of the couple in Arizona. Mr. Schmidbauer told me that defendant, and Mrs. Armstrong have a place of their own in Cabo San Lucas and have visited this place for periods ranging from several weeks to several months over the past ten years. Although Mr. Schmidbauer did not know the exact details of the Armstrong's place in Mexico, he knows about their residence in Mexico based on direct conversations with Mr. Armstrong and because he picks up the couples' mail from their rental mail box in Lake Havasu City, Arizona when they are out of town. Mr. Schmidbauer also stated he knows that Mrs. Armstrong sells real estate in Mexico, an observation that is consistent

with the real estate website that I identified for Mrs. Armstrong and about which I testified at the June 21st hearing.

13.     The recorded conversations of the couple while the defendant was housed in Imperial County, California also reflect continuing ties and connection to Mexico. During these conversations, at one point, in the context of discussing possible bail for the defendant, Mrs. Armstrong questioned whether the government could consider the defendant a flight risk because the couple have a have a house in Mexico. At other points, Mrs. Armstrong indicates that she needs to return to Cabo San Lucas for business and states that she will try to sell the couple's vehicle in Mexico when she returns. The defendant also discussed at various points efforts to have one of the defendant's friends or associate fly Mrs. Armstrong back "South," an apparent reference to Cabo San Lucas, and something consistent with my determination that the defendant continues to have access to people who can provide private air transportation.   FAA records which I have identified since the June 21st hearing corroborate that the defendant has had frequent travel between the United States and Mexico; a representative from the Federal Aviation Administration has informed me that the defendant's airplane, tail # N5509Y, filed numerous flight plans for travel between the United States and Mexico and that FAA records indicate over twenty round trips for this plane between 2006 through 2010.

14.     As part of my additional investigation, I also attempted to get further information about the degree of difficulty that a person without a passport would have in entering Mexico from the United States. In this regard, I spoke with a U.S. Customs and Border Protection agent that has worked the U.S./ Mexico Boarder within the past year. The agent advised me that the absence of a U.S. Passport would not preclude someone from traveling from the U.S. to Mexico by car or on foot. The agent stated that vast majority of vehicles and pedestrians leaving the U.S.

and entering Mexico at manned checkpoints are not stopped at all by either U.S. Customs and Border Protection or the Mexican authorities. U.S. pedestrian and automobile travelers are supposed to have a U.S. Passport to re-enter the United States, but they are not required to have a U.S. Passport to enter Mexico. The agent informed me that the lack of a U.S. Passport would pose no problem at all for someone wishing to travel from the U.S. to Mexico by car, or on foot. The agent stated the absence of a passport would pose a problem for people traveling by commercial air carriers. The agent also stated there is nothing to stop someone from driving or walking across the Mexican Boarder in areas not manned by Customs and Boarder Protection or Mexican Authorities, of which there are many in Arizona and New Mexico.

15. Since the June 21st detention hearing, I have also investigated the practical limitations of electronic home monitoring as a condition of the defendant's pretrial release, as advocated by the defense. I spoke with a Probation officer of the U.S. Department of Probation in Colorado regarding electronic monitoring in Arizona. The Probation officer indicated that he had contacted the U.S. Probation Office in the District of Arizona and had learned that U.S. Probation does not have offices in either Lake Havasu City, Arizona or Prescott, Arizona, the two locations of the defendant's Arizona residences. This officer stated those areas are serviced by other U.S. Probation offices and that, as a best case scenario, the response time for a probation officer to make a personal contact regarding an electronic home monitoring alert would be at least two hours and that the probation officer would typically have to reach out to local law enforcement officers for any sooner response. The officer indicated that the electronic home monitoring system was such that an alert would only show that the defendant had left his premises and would not indicate his location or route of travel, allowing a defendant inclined to flee an opportunity for a good head start on law enforcement. I also discussed with this officer

how the system would function when the defendant had to travel to Colorado for case-related purposes. The officer advised me that the system would not function at all, as the probation office would turn off the system while the defendant was in travel status. The officer stated, in short, that the systems was only able to tell if the wearer of device was home or not, and not much else.

16.     Finally, I note that the defendant asserts in his motion that he has no history of disobeying government authority. I know this to be at variance with the evidence that I have uncovered in this case, in connection with the defendant's response to IRS collection efforts. In addition to comments that the defendant made to the revenue officer assigned to collect the refund money from the defendant (a subject of my testimony), the defendant has made written submission indicating unwillingness to acknowledge federal government taxing authority. In specific, in response to IRS collection activity, the defendant has mailed several letters to the IRS, and/or U.S. Treasury. On or about June 19, 2009, the IRS sent the defendant notices stated he owed roughly $1.6 million to the IRS. Mr. Armstrong responded by taking the IRS notices, and stamping "ACCEPTED FOR VALUE AND RETURNED FOR VALUE FOR SETTLEMENT OF REFUND AND CLOSURE DATE: JULY 23, 2009 EXEMPTION #0410-0001-4 \ 0049742083" on them and returning them to the IRS officer. The returned notices were accompanied by a letter stating the IRS officer was breaking the law and would be subject to "pains and penalties" as a result. The letter also states the defendant and his wife are bonded for $100 Billion each and that the IRS must pay that amount to him prior to taking anything from him. In general the correspondence is difficult to understand, but I would certainly characterize it as defiant of government authority. In his correspondence, the defendant also states he is a "sovereign" person, apparently in the context of asserting how he is not subject

to the taxing jurisdiction of the IRS or government authority generally. The defendant's correspondence is consistent with individuals who believe they are sovereign citizens and therefore not subject to Federal laws.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 22nd day of July 2010 at Denver, Colorado.

GREG M. FLYNN, SPECIAL AGENT
INTERNAL REVENUE SERVICE,
CRIMINAL INVESTIGATION DIVISION