1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLORADO

3   Criminal Action No. 10-cr-00317-REB

4   UNITED STATES OF AMERICA,

5       Plaintiff,

6    vs.

7   RICHARD KELLOGG ARMSTRONG,

8       Defendant.

9   _____

10                  REPORTER'S TRANSCRIPT

11   HEARING ON MOTION FOR RECONSIDERATION OF ORDER OF DETENTION
    _____

12

13         Proceedings before the HONORABLE ROBERT E. BLACKBURN,

14   Judge, United States District Court for the District of

15   Colorado, commencing at 10:00 a.m., on the 23rd day of July,

16   2010, in Courtroom A1001, Alfred A. Arraj United States

17   Courthouse, Denver, Colorado.

18                      APPEARANCES

19         KENNETH HARMON, Assistant United States Attorney, 1225

20   17th Street, #700, Denver, Colorado, appearing for the

21   Government.

22

23              Suzanne M. Claar, Official Reporter
                        901 19th St.
                  Denver, Colorado, 80294-3589
24                      (303)825-8874

25       PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY
              TRANSCRIPTION PRODUCED BY COMPUTER

1                         APPEARANCES (Continued)

2            RICHARD K. KORNFELD, RECHT & KORNFELD, 1600 Stout

3 Street, #1000, Denver, Colorado,  appearing for Defendant.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        P R O C E E D I N G S

 2          (Proceedings commenced at 10:00 a.m.)

 3               THE COURT:  Good morning, and thank you.  Please be

 4     seated.

 5               Thank you.  This is case 10-cr-317, identified for our

 6     purposes as United States of America v. defendant No. 2, Richard

 7     Kellogg Armstrong.

 8               The matter is before this court for hearing of the

 9     defendant's Motion to Reconsider Magistrate's Order of

10     Detention, document No. 43, filed on July 14, 2010.

11               Commencing with the government and transitioning to the

12     defense, gentlemen, may I have your appearances, please.

13               Mr. Harmon.

14          MR. HARMON:  Good morning, your Honor, Kenneth Harmon

15     on behalf of the United States and seated at the government's

16     counsel table with me is the government's case agent, IRS

17     Criminal Investigation Division Special Agent Greg Flynn.

18               THE COURT:  Gentlemen, good morning.

19          MR. KORNFELD:  Good morning, your Honor.  Rick Kornfeld

20     on behalf of Mr. Armstrong.  He is present in custody.  Seated

21     with me also is my investigator, Kevin Knierim, K-N-I-E-R-I-M.

22     I would ask leave of the court to allow Mr. Knierim to sit at

23     counsel table and to assist me.

24               THE COURT:  Gentlemen, good morning.

25               MR. KORNFELD:  May I also ask, your Honor,
```

1      Mr. Armstrong, has some hearing issues, and I am wondering if I

2      may ask that he can wear the electronic enhancer.

3              THE COURT:  You may ask, and having asked, your request

4      is granted.  Madam clerk, your assistance, please.

5              MR. KORNFELD:  Thank you, your Honor.

6              THE COURT:  You are welcome.  Does the government

7      object to the defendant's request that his investigator be

8      permitted to remain at defense counsel table during this

9      hearing?

10             MR. HARMON:  No, your Honor.

11             THE COURT:  Then the request is granted.  Thank you.

12             Importantly, I note the appearance of Mr. Keith

13     Williams from the Probation Department.  Good morning.

14             THE PROBATION OFFICER:  Good morning, your Honor.

15             THE COURT:  Very well.  Assuming that we are prepared

16     to proceed to hearing as stated and understood by the court,

17     counsel, are there preliminary matters otherwise before we

18     proceed to hearing?  Any such preliminary matters by the

19     government?

20             MR. HARMON:  No, your Honor.  I just want to make sure

21     that despite the lateness of my filing the court is aware that I

22     did file a written response at the end of yesterday that

23     basically was simply a pleading that attached a declaration of

24     this case agent to provide supplemental facts of the court to

25     consider.

1          THE COURT:  One moment, please.

2          MR. KORNFELD:  Thank you, your Honor.

3          THE COURTROOM DEPUTY:  Your Honor, it's hard to tell

4    when there is no sound.

5          THE COURT:  Are you able to hear me now?  Apparently

6    not.

7          THE COURTROOM DEPUTY:  I don't know.  But they are not

8    working with this channel.

9          MR. KORNFELD:  Your Honor, Mr. Armstrong indicates that

10   he is comfortable proceeding, even though there are some

11   technical issues and I will certainly try to speak up.

12         THE COURT:  Very well.  Let's all speak in voices

13   hopefully loud enough for Mr. Armstrong to hear clearly.  To the

14   extent that we need to reposition him in the courtroom to

15   facilitate his hearing and understanding of the proceedings, I

16   will entertain an appropriate request at any propitious time.

17         Very well.  In response to your question, Mr. Harmon,

18   yes, I have received your paper entitled Government's Response

19   and Submission to Defendant's Motion to Reconsider Magistrate's

20   Order of Detention, document 49, filed yesterday July 22, 2010.

21         MR. HARMON:  Thank you, your Honor.

22         THE COURT:  Preliminary matters by the defense?

23         MR. KORNFELD:  None, your Honor.

24         THE COURT:  What evidence, if any, do the parties

25   contemplate presenting during this hearing?  Before you respond

1    to my query I have in mind, of course, the transcript that now

2    exists of the June 21, 2010, detention hearing before Magistrate

3    Judge Tafoya.  I intend to take judicial notice of the

4    adjudicative facts and thus evidence presented during that

5    hearing.  First, any objection by the government?

6              MR. HARMON:  No, your Honor.

7              THE COURT:  Any objection by the defense?

8              MR. KORNFELD:  No, your Honor.

9              THE COURT:  Now, back to my original question which

10   obtains, what additional evidence is contemplated by the

11   parties?  Hearing first from the government who has ultimately

12   the burden of persuasion.

13             MR. HARMON:  Your Honor, I believe there were two

14   government exhibits that were introduced and admitted at the

15   hearing.  I know that the transcript has been ordered.

16             My understanding is that the clerk's office also has

17   both -- one of the exhibits publicly filed, and that I believe

18   is Exhibit 2 to that hearing.  There is another exhibit, Exhibit

19   1, which I think is submitted under seal.

20             I would ask that the court also consider those two

21   exhibits, and I would ask the court consider as well the

22   declaration that we filed as document 49-1 yesterday, the

23   declaration.

24             THE COURT:  Response by the defense to the government's

25   request.  Mr. Kornfeld.

1          MR. KORNFELD:  Your Honor, I have no objection to the

2     court considering all of that evidence, including the

3     declaration.

4          THE COURT:  Thank you.  Madam clerk, I may need your

5     assistance eventually in procuring the two exhibits that relate

6     to the June 21, 2010, detention hearing before Judge Tafoya.

7          What evidence, if any, is contemplated to be presented

8     during this hearing by the defense, Mr. Kornfeld?

9          MR. KORNFELD:  Your Honor, the only thing -- Mr. Harmon

10    and I discussed this.  I refer in my motion to some recorded

11    telephone conversations that were provided to me pursuant to

12    Rule 16.

13         Agent Flynn in his declaration also talks about his

14    review of some of those as well.  I have prepared a disc.  I

15    will tell the court roughly I think there is about two hours

16    total of conversations.  Agent Flynn will correct me if I am

17    wrong.  But the number in 21, 22 different conversations that I

18    have marked this as Defense Exhibit 1.

19         Mr. Harmon has indicated to me that he does not object

20    to the court at its convenience listening to these conversations

21    should the court so wish.

22         MR. HARMON:  And, your Honor, that's correct.  I did

23    not ask Mr. Kornfeld, but I am pretty sure I know what his

24    response would be.  The disc that he is going to tender to the

25    court, and I have something as well, includes the entire set of

1    recording conversations, not just the ones the defense is

2    relying on or arguing.

3              MR. KORNFELD:  That's right.

4              THE COURT:  Any objection to the court receiving and

5    using for the limited purposes of this hearing the defendant's

6    disc and that is marked how, Defendant's Hearing Exhibit 1?

7              MR. KORNFELD:  Yes, your Honor.

8              THE COURT:  Any objection by the government?

9              MR. HARMON:  No objection.

10             THE COURT:  Thus, for the limited purposes of this

11   hearing, Defendant's Hearing Exhibit 1 for identification

12   admitted in evidence.

13             Mr. Kornfeld, if you will tender that to the courtroom

14   deputy clerk, please, and thank you.

15             MR. KORNFELD:  And other than that, your Honor, I don't

16   anticipate presenting anything else.  I do have a printed out

17   clean copy of the Judge Tafoya hearing transcript if the court

18   wishes, and I can either mark it or not mark it, but we have

19   printed out a clean copy if you wish.

20             THE COURT:  So that no tree shall have died in vein,

21   any objection to the court receiving this transcript?

22             MR. HARMON:  No objection.

23             THE COURT:  Very well.  It need not be marked.  If you

24   will tender that to the deputy courtroom clerk as well.  And

25   thank you.  And I am receiving that copy of the June 21, 2010,

1    detention hearing transcript now.

2          Mr. Harmon you were waving a disc.

3          MR. HARMON:  My disc I think is superfluous because

4    Mr. Kornfeld has told me it has got the exact same audio files

5    on as his.  So I will just put it down and stop waving it.

6          THE COURT:  Very well.  If there is no additional

7    evidence then I am prepared to receive your argument, commencing

8    with the government, again whose burden it is.  Mr. Harmon.

9          MR. HARMON:  Thank you, your Honor.

10          Your Honor, I have three basic straightforward points

11   and propositions that I believe is derived and supported by the

12   evidence.  And then I will elaborate on each of them.

13          The first proposition is that the defendant has a home

14   and he has indeed a life in Mexico, specifically Cabo San Lucas.

15          The second proposition is that the defendant has an

16   incentive to flee to Mexico and to that particular location.

17          The third proposition is that the defendant has both

18   the ability, the capability, to actually physically flee to that

19   location, and more importantly or just as importantly the

20   ability to stay there for quite a bit of time.

21          And given those three things, I believe if the court

22   finds that those three propositions are supported by the

23   evidence, then the court should also conclude as a logical

24   matter that the detention findings that were made first by the

25   Magistrate Judge in the Southern District of California, and

1    then by Judge Tafoya after a fairly lengthy hearing in June,

2    that those detention findings are in order, and that the court

3    can safely conclude by a preponderance of the evidence that the

4    defendant is a risk of flight and that there is no combination

5    of conditions, short of detention with the marshal, that will

6    assure his appearance for court and his abidance by standard

7    court orders.

8           So with respect to each of those propositions, I would

9    like to reiterate what I think -- or rehearse what I think is

10   the evidence that supports it.  The defendant has a home and

11   life in Mexico.  I believe that was the subject of the hearing.

12   And Agent Flynn testified about that.

13          But Agent Flynn also did some more investigation after

14   the hearing that is set forth in his declaration.  And one of

15   the things that Agent Flynn did was he actually talked to a

16   neighbor in Arizona of both Mr. and Mrs. Armstrong, a neighbor

17   that lives in the Lake Havasu area.

18          So that he is close enough and trusted them enough by

19   the Armstrongs that he attends to their house and gets their

20   mail when they are not in Arizona.

21          And this neighbor said that he understood from

22   Mr. Armstrong directly, and just otherwise being a caretaker of

23   that premises, that at least for the last ten years the

24   Armstrongs have regularly been going to Cabo San Lucas.

25          They actually have a place there, and that the wife,

1    Mrs. Armstrong, has a business, real estate business there.  She

2    sells real estate.

3           And that corroborates the web site that Agent Flynn

4    identified in the hearing that we printed out two pages of, the

5    first two pages, and I told Judge Tafoya at the time, and I will

6    reiterate to the court that I think the picture is just as good

7    as a thousand words.

8           That web site capture, those two pages, showed Mr. and

9    Mrs. Armstrong in a scene that appeared to be the offices of

10   their real estate office with a fish in the background.  It had

11   local telephone numbers, and if you go on that web site you are

12   going to see a pretty healthy set of listings.

13          In the tape-recorded conversations Mrs. Armstrong puts

14   to rest any doubt that is a home of theirs, and she acknowledges

15   in these recorded conversations that took place at the Imperial

16   County jail in California, between the time of the defendant's

17   initial arrest and today or before his transport to Colorado,

18   that she understood that the government would fight detention,

19   would fight release because they had a home in Cabo San Lucas,

20   and she said in other conversations that she had to return down

21   south, she used the words, and I think it's fairly clear from

22   the context that she is referring to Cabo San Lucas.  That she

23   indicated that she had to return there because she had business

24   to take care of.

25          So I think it's clear beyond a doubt, not even just a

1    preponderance but more so beyond a doubt, that this couple has a

2    functioning home and have had it for the last ten years at

3    least, and they now work down in Mexico.  And so the problem is

4    Mr. Armstrong has an incentive to go down there.  Well, Mr.

5    Armstrong has an incentive notwithstanding any conditions of

6    release and will he come back voluntarily if he has an incentive

7    to go to Mexico.

8         And that leads me to the second proposition and point

9    of my argument, which is he does have incentive to flee to

10   Mexico if this court were to release him on any conditions of

11   release.

12        And my assertion on that is basically premised

13   basically on three things.  One is what is this case about.  Is

14   it a compelling case, is it a strong enough case that this

15   defendant would fear the consequences, which is the second point

16   I will get to.

17        It is a strong case.  I know that the defendant in his

18   papers suggested that the case is somewhat tenuous because it

19   revolves around the issue of *mens rea*, did the defendant

20   intentionally and knowingly intend to violate the law.  And I

21   think in that regard the defense counsel is right.

22        As with most white collar cases the factor isn't going

23   to be what Mr. Armstrong did.  It's going to be fairly clear

24   that what he did is he filed amended tax returns and was able to

25   reap more than $1.6 million of treasury funds, and he attempted

1    to do another false return after that for the 2008 year.

2            The question is whether did he know what he was doing

3    and did he know it was wrong.  And ultimately the question is

4    because the charges are fairly straightforward, did this

5    defendant know that what he was putting in the tax returns to

6    get this money was false.

7            And all you have to do is look at the tax returns.

8    It's evident from the complaint what we are talking about.  To

9    get the refund money and to determine what the defendant knew

10   and what he didn't know, all you have to take a look at is the

11   representations.

12           And this scheme basically involved the defendant and

13   like-minded people basically saying that when they had a

14   mortgage with a financial institution, to take an example like

15   Wells Fargo, for a hundred or $200,000, what they did with that

16   figure is instead of acknowledging it as a liability, they said,

17   no, I made that in income, and by the way, I also made

18   approximately -- the government -- the loan institution also

19   withheld taxes from me of that amount.

20           That's the engine that drives all these false refund

21   claims.  And so the question for the jury is going to be, did

22   this defendant know that when he was putting down a million

23   dollars for debt obligations and representing his income and did

24   he know when he put down that a million dollars was withheld in

25   taxes, did he know if that was true or not.  And I think the

1   answer is going to be fairly obvious he is going to know it and

2   the government is going to prove it and I don't think the

3   defendant is going to have anything to put up there to dispute

4   it.

5            So I submit the case is a strong one.  And actions

6   speak louder than words, and to reinforce the government's proof

7   that the defendant knew and intended to violate the law, we will

8   establish from the evidence that the defendant quickly attempted

9   to move out of the reach of the IRS, in other words the

10  visibility of the IRS virtually all these proceeds.

11           And that became the subject of Agent Flynn's testimony

12  at the hearing, and he also rehearsed that information in the

13  declaration.

14           So both what he was putting in those returns to get

15  these refunds and both what he did with the money will show that

16  the defendant well knew what he was doing was wrong, and in turn

17  that will show that the government has a substantial case.

18           Well, what does that mean in terms of the incentive for

19  the defendant to flee?  If it's a case that's likely to result

20  in a probationary sentence it might not mean anything.  I mean

21  why would the defendant uproot his life and go someplace else if

22  basically he is looking at a probationary sentence.

23           That's not the case here.  You can see from the

24  complaint that the defendant attempted to derive from the

25  government and cause loss to the government in excess of

1    $3 million, and it's a fairly easy guideline calculation to

2    realize that even with a defendant who is a criminal history

3    category I, a defendant like that is going to be looking at an

4    advisory guideline sentence of between 57 and 71 months.

5         And that's something that I mentioned to Judge Tafoya.

6    So as I indicated to Judge Tafoya, given this defendant's age

7    where he is at in life and given that prospective sentence if

8    the court is inclined upon a conviction on a strong case to give

9    a guideline sentence, that bolsters the common-sense

10   understanding that the defendant has a very good reason to flee.

11   He may be seeing the rest of his natural life in prison.

12        So the next question is, is there anything in the

13   defendant's background that would mitigate or drive against that

14   common-sense conclusion that if you have got a strong case and

15   there is a likelihood of conviction and there is a likelihood of

16   a sentence that may result in the rest of your life in prison,

17   is there anything in this defendant's background to say, you

18   know what, he is still going to stay here and he is still going

19   to honor his court obligations, and that's part of the subject

20   of defense counsel's pleadings.  So my question was to Judge

21   Tafoya, what do we really know about the defendant and how do we

22   know it.

23        If you were to take a look at what he told pretrial

24   services, in effect what he, when he had the only opportunity to

25   directly talk to the court through a pretrial services office,

1    what he told the court about himself is very telling.

2            What he didn't tell them was anything about connections

3    to Mexico.  Didn't mention the Cabo San Lucas house at all.  We

4    had to be the ones that brought that out in the case both to the

5    Magistrate Judge in California and to the Magistrate Judge here

6    in Colorado.

7            He also does not talk about any money offshore.  He

8    doesn't talk about making any money or having any assets other

9    than Social Security and comfortable retirement, and of course

10   he tells the pretrial services that he is retired and that's

11   what he told the FAA when he was applying for a pilot's license.

12           But it's not necessarily what he told lenders when he

13   wanted money.  What he was telling lenders when he wanted money

14   was that he was some manager of an entity called Bonanza

15   Pacific, which when you look at the tax returns seems to be some

16   complex foreign Canadian trust.

17           And basically what they are seeing is that he is

18   getting a lot of money or he is moving a lot of money offshore

19   and he is getting money back.

20           And Agent Flynn describes in his declaration how that

21   kind of movement is consistent with a typical asset shelter

22   scheme.  Is that he put money offshore and he led through a

23   Byzantine structure of financial transactions you conceal your

24   ownership of the money and then money comes back from some type

25   of foreign source to your benefit and it's characterized, often

1    categorized, I should say, as a loan.

2         The bottom line I think is this on what the defendant

3    has abroad and what he has access to, even though we didn't get

4    that information from the defendant in his pretrial services

5    interview.

6         We know this.  And I think you can conclude this beyond

7    a doubt.  That the defendant got a lot of money from the IRS.  I

8    don't think the defendant will dispute that.  It was actually

9    deposited into an account in December 2008.

10        Most of the money has not been recovered by the IRS.  A

11   fraction of it has been recovered.  A lot of the money, if you

12   credit Agent Flynn's testimony both before Judge Tafoya at the

13   hearing and in his declaration where he summarizes that tracing

14   of assets, a lot of that money is offshore.  More than 350,000.

15        And I think you will find from the declaration that

16   both before the money was moved offshore and after, the

17   defendant was getting substantial regular payments from foreign

18   banks, specifically banks in Belize.

19        Here is another thing I think is clear.  Whatever the

20   defendant's financial condition is, whatever dollars he has,

21   whatever amounts and wherever it is, he pretty much has today

22   what he had the day before he got arrested.

23        This is not a defendant who is going to be spending a

24   lot of money on his legal defense.  Mr. Kornfeld is a private

25   attorney but he is here as a CJA panelist, as a CJA member, and

1    all of the defense is being footed by the taxpayers.  So it's

2    not a case where he may have had a lot of funds and now it will

3    go to towards the defense of a white collar case.

4         So what did he have before other than what you can see

5    from the tracing of the agents, you can also see that from the

6    common-sense observations you can make from the evidence about

7    the lifestyle of this couple.

8         And some of that actually comes from the recorded

9    conversations.  This is a couple where you know they had an

10   airplane.  The IRS seized it.  There is no dispute that the

11   defendant owned it either at one point through a shell company

12   and later on directly, but it's an airplane that has substantial

13   worth.

14        They tell you in the recorded conversations, the couple

15   discussing in their reported conversations how at the time of

16   the defendant's arrest they were renting two airplane hangars in

17   Arizona for this airplane.  They have a maid.  They have a pool

18   maintenance person.  And they have other people that help them

19   out.  At least that's what they told you.

20        So whatever he had before the cuffs were put on him

21   it's likely he has now.  Now maybe it's secreted a little bit

22   further and not available for the government to reach, but it's

23   certainly available for him to reach.

24        And that leads to my third and final basic premise and

25   proposition is that the defendant has the capability to flee to

1   Mexico and to stay there.

2          Well, let's first talk about the capability because one

3   of the things I think that the defense will talk to you about is

4   fashioning conditions that will make it difficult for him to

5   actually get across the border.  One of the things after the

6   hearing was to research that and see what would be the real

7   effect of conditions and what would stop this defendant from

8   actually crossing the border.

9          And I think the unfortunate news on that regard as it's

10  reflected in the declaration is as that we kind of understand

11  from our daily lives and our understanding of what we see in the

12  public media, not much.  Not much will prevent this defendant,

13  if he is so inclined, either by foot or by car or by private

14  plane, to just get up and leave someplace in Arizona where he

15  may be released on bond and get across the border.

16         There is information related from a Customs Border and

17  Protection Agent, who is now with ICE, who patrolled that border

18  who basically tells the court through Mr. Flynn's declaration

19  what the reality is, and the reality is there is a lot of

20  checkpoints and there are a lot of places that aren't covered by

21  checkpoints.

22         In either event it's unlikely that somebody is going to

23  look for a passport.  So the reality is you can get across by

24  land and you can get across by private airplane, and the tapes

25  indicate that Mr. Armstrong -- when Mr. Flynn was testifying he

1    was cross-examined about whether he really knew about --

2    Mr. Flynn knew about Mr. Armstrong having access to friends who

3    had private planes, and maybe at that point Mr. Flynn was

4    basically making a conjecture based on his understanding of the

5    case.

6            You don't have to have that conjecture anymore.  That's

7    in the tapes.  There are several conversations where Mr. and

8    Mrs. Armstrong are talking about Mr. Armstrong trying to get

9    pilot friends to arrange to fly Mrs. Armstrong back south.

10           So it's clear from the tapes and it's clear from the

11   agent's investigation of the defendant's background it's clear

12   from common sense that even if this defendant's pilot license is

13   yanked, he will have friends in the private air community who

14   have at their disposal airplanes.

15           All he needs to do is ask for a ride.  He doesn't need

16   to give a background check to those people to get on an airplane

17   and go to where he wants to go.

18           One of the conditions that the court can fashion to

19   prevent that -- well, one of them may be a cash bond.  The

20   defendant took $1.6 million of the taxpayers' money in this case

21   so unless the court is fashioning a bond beyond that, I would

22   submit that that bond alone would not be an incentive to stay

23   because basically in the colloquial sense the defendant would be

24   playing with house money or would be playing with house money or

25   paying house money and that's our taxpayer money.

1          So I don't that's a condition that would ensure him

2   returning and going across the border to Mexico when he has

3   incentive to do so.

4          The other main point that the defense made in the

5   detention hearing in front of the Judge Tafoya, and I will

6   assume will reiterate to your Honor, is electronic -- a home

7   detention with electronic monitoring.

8          Agent Flynn talked to the probation office.  He talked

9   to Keith Williams and he talked to people who Keith Williams

10  talked to, and they in turn talked to the probation officers in

11  Arizona who would be doing the monitoring, and the bottom line

12  is this.  With whatever residence if you were to choose to

13  release the defendant to, whether it's in Lake Havasu or if it's

14  in Prescott, it's going to be miles and hours away physically

15  from where the Probation Officer who would be monitoring the

16  defendant would be.

17         Maybe that's a problem, maybe it's not.  Maybe if there

18  is an alert and the defendant takes his bracelet off, it's

19  nothing more than a telephone call to a local law enforcement

20  officer, but we are betting and hoping that the law enforcement

21  officer will pick up the phone and respond in time.

22         Be that as it may, the big concern for me and I think

23  the concern I would like the court to think about is this.  This

24  defendant, if he is released on the conditions that the defense

25  is advocating, will be going back to Arizona.

1          He has a perfect right, and indeed he is going to have

2    an obligation to come back here to Colorado for his court.  He

3    is going to have to get in his car to do that.  He is going to

4    have to drive a long way, and if he doesn't get in the car, he

5    has to get in an airplane.

6          And basically what the probation office is telling us

7    is that when he is in travel status he has got that ankle

8    bracelet off.  And he is not monitored at that point.  And so

9    there will be no way to tell for a short period of time, for

10   hours of time where the defendant will be.

11         Now we will tell if he made it to the court or not in

12   half a day or a day.  But by that time the defendant only needs

13   to make a U-turn on the interstate to go south and then to go

14   across and eventually to a place where he has connections and he

15   has ties.

16         And that leads me to the final component of this last

17   point, which is does he have the ability to stay in Mexico.

18   Well, this defendant is not like a 25-year-old commodities

19   trader in New York City who had a lot of money and thinks it

20   would be neat to send it offshore to some foreign locale.  Who

21   has never seen the place and just seen it in pictures and never

22   been there.

23         This defendant has lived there.  He lives in an

24   ex-patriot community, he knows the place, he has a life there so

25   there is even a realistic possibility he has a home there.  More

1    than a realistic possibility.  There is a probability.

2          And he has the money, I would submit, to stay for the

3    duration.  I won't bore the court with the details of how to get

4    to that process, but I think Agent Flynn lays that out in his

5    declaration.

6          So basically I believe that these three points are well

7    founded from the evidence, and if you believe these points are

8    well founded then it ineluctably leads to the conclusion that

9    detention is what's warranted here.

10         Again, the point being he has a home and a life in

11   Mexico.  He has the incentive to flee to Mexico.  And he has got

12   the ability and the capability to actually get to Mexico and

13   stay there for the duration.

14         THE COURT:  Counsel, thank you.

15         The defendant's position, Mr. Kornfeld.

16         MR. KORNFELD:  Thank you, your Honor.

17         THE COURT:  You are welcome.

18         MR. KORNFELD:  Your Honor, I am going to try to respond

19   to some of the arguments obviously that I anticipated and that

20   were well articulated, as they always are, by Mr. Harmon, and

21   also some of the facts averred by Agent Flynn in the declaration

22   which I did receive and review late yesterday.

23         Mr. Harmon spoke about three overarching principles,

24   and frankly, the uber overarching principle, really what

25   controls his argument and the logic of his argument is the

1    assumption that this man will flee.  The assumption that this

2    man is wealthy.  The assumption that this man has an incentive

3    to flee because he is charged with a federal felony which

4    carries with it, if convicted, presumptive time in the custody

5    of the Bureau of Prisons.

6             The problem with that assumption, your Honor, is that

7    is exactly what it is.  It is an assumption.  And while the

8    government in this case may assume that, Congress didn't assume

9    it.

10            This is not a case where there is a presumption of

11    detention.  This is not a class of cases where there is a

12    presumption of detention.

13            This courthouse and Federal Courthouses around this

14    country are replete with, quote, unquote, white collar

15    defendants with assets facing federal felonies who have the same

16    incentive if you believe Mr. Harmon and much more money, even if

17    you believe the government that he has $1.6 million sitting

18    somewhere.

19            They have every incentive to do that, and yet Congress

20    said, not so fast.  And there are many, many defendants in this

21    court's personal experience, my experience, Mr. Harmon's

22    experience, and the agent's experience who aren't detained, and

23    in fact, the codefendant in this case, Mr. Morris, I believe got

24    an OR bond, but I certainly know is not detained.  So I have to

25    take issue with that assumption and point out that it is exactly

1    that.

2          Yes, he is charged with a felony.  The vast majority of

3    criminal defendants in the federal system are charged with

4    felonies that carry with it significant BOP time.

5          In fact, 57 to 71 is real time but it's not off the

6    charts -- off the sentencing guideline charts.  Folks like sort

7    of the bellwether white collar defendant in this district,

8    Mr. Nacchio, have lots more money, lots more incentive to flee

9    lots more serious charges so I have to take issue with that

10    logic and point out the obvious.

11          The second overarching assumption that I have to take

12    issue with, your Honor, is that this whole process, what's

13    really suggested, although obviously not argued overtly, is

14    unless you, your Honor, can guarantee, can look into the future

15    and can guarantee that this gentleman will come back, unless you

16    can fashion conditions that will guarantee that, then you should

17    affirm the order of detention.

18          And as the court well knows that's not what 3142 says.

19    3142 talks about the conditions or combination that will

20    reasonably assure.  Because Congress notes, sometimes they don't

21    but in this case they are aware of the obvious, which is we

22    can't predict the future.

23          And in the transcript of the hearing in front of Judge

24    Tafoya, on cross-examination Mr. Flynn indicated to me in answer

25    to one question, well, counsel, I can't predict the future.

1   Right, we can't predict the future.

2          So what we are talking about is can we fashion some

3   conditions that will reasonably assure this 76-year-old white

4   collar defendant with no prior criminal history continued

5   participation in this prosecution.  That's the overarching

6   assumption.  That's what we have to assume obviously that the

7   court needs to consider, and that I know the court will

8   consider.

9          I first wanted to point out, and they are touched on in

10  my motion, some significant factors that have occurred since we

11  argued before Judge Tafoya which I think are pertinent to this

12  court's consideration.

13         Um, the first is the pending motion, the Interest of

14  Justice/Complexity Motion for which -- and we filed that.  That

15  was a joint motion, and I filed it, your Honor.  And I filed it

16  because my -- in the exercise of my ethical and professional

17  duties it was my opinion that this case could not be brought to

18  trial in August.  And Ms. Wayne, counsel for Mr. Morris joined.

19  The government did not object, and the court was kind enough to

20  set it for hearing on October 22nd.

21         So what that means as a practical matter, of course, is

22  there is going to be some longer period of time than what Judge

23  Tafoya assumed when we were given the speedy date and the 70-day

24  date for sometime in August.

25         And the second factor, and I don't know the status but

1    Mr. Harmon was kind enough to indicate that the government may

2    be superseding and may be adding additional defendants, and if

3    that happens, that might be happening sometime in August.

4          He can speak for himself, but if in fact that comes to

5    pass that is relevant to the calendaring and therefore the

6    period potentially of pretrial detention.  That's a very, from

7    our standpoint, a significant change in the situation.

8          There are some practical issues, your Honor.  I have

9    visited Mr. Armstrong, I don't know, at least half a dozen times

10   at the FDC.

11         This is a case where I have been provided three

12   computer discs comprising approximately 7500 pages of written

13   discovery, 21 or so audio calls, some grand jury material, which

14   I am not allowed to disclose directly to him, and in speaking

15   informally with the agent, probably more is coming.

16         As a practical matter, it is very difficult for

17   Mr. Armstrong to review that.  I was told, and based on prior

18   experience, that there are computers at the FDC whereby

19   defendants can review their disc discovery.  Mr. Armstrong

20   indicates to me that that is not the case.  There are in fact

21   computers.  There is now an e-mail system between inmates and

22   their counsel.  But that poses a very practical problem, and I

23   have not sought leave under CJA to pay for the copying of 7500

24   pages of material, and perhaps I might have to do that in the

25   future, but as a practical matter that is a difficulty in

1    preparing his own defense.

2           From my perspective, the attendant practical difficulty

3    is this is a paper-intensive case, and I disagree with

4    Mr. Harmon that this is an overwhelming case for the government.

5           The battle lines are *mens rea*, and that's generally why

6    there are trials in white collar cases.  As I indicate in my

7    motion, this is not a man who woke up one day and decided to

8    file this form.

9           The evidence will show that he consulted various

10   individuals.  There are lots of written documents, some known to

11   the government, some unknown to the government because I am

12   conducting my own investigation, that will go to what he

13   believed, why he believed it, who told him, *et cetera*.

14          He does not have access to those materials.  They are

15   in Prescott, Arizona.  He cannot access his on-line financial

16   records, and we even tried to provide it to us, his passwords,

17   but the systems are sensitive enough where the banking system

18   recognized that it was coming from a computer it didn't

19   recognize and wouldn't allow us in.

20          And even if he had access to a computer at the FDC, the

21   FDC does not allow inmates to have any Internet access other

22   than through this corrections linked e-mail system, which is

23   actually a very nice thing for communication purposes, but of no

24   help for this purpose.  So that is a very real pragmatic problem

25   in terms of his ability to defend himself.

1       And the other factor which I did touch on but it

2  continues to be an issue with the passage of time is this, your

3  Honor.  Mr. and Mrs. Armstrong had two sons, one of whom passed

4  away two days prior to his arrest.  He passed away on May the

5  18th of this year.

6       And Mr. Armstrong flew back on May 20th to attend the

7  funeral, was quickly arrested, didn't attend the funeral.  He is

8  and they are in a period of bereavement.  I don't think -- I

9  think I state the obvious, as a parent and as a human being that

10 his inability to be with his wife, to be with their other son

11 and their grandchildren during this very, very difficult time is

12 significant, and it gains significance over the passage of time.

13      And that is just part of the practical reality and part

14 of the detriment to being incarcerated.  And it's a little bit

15 different now, two months post-death not having any physical

16 contact with his wife, not even a hug to talk about -- just sort

17 of deal with the death of their son.  It's an issue.

18      With respect, your Honor, to the 3142 factors, I am not

19 a believer in essentially reading my moving papers because I

20 know this court and your colleagues read what lawyers write, and

21 you were kind enough to schedule a hearing very quickly, and for

22 that we are very grateful.

23      But I do want to -- I do want to just point out a

24 couple of things.  In terms of the nature of the case, we all

25 know what it's about, and again my experience is not directly

1    relevant to the court's.  The court's experience is what is most

2    important.

3              But I think all of us that do -- that kind of swim in

4    the federal criminal waters know that it is somewhat unusual in

5    a white collar case first-time criminal charge for someone to be

6    detained.  And again, in this case the codefendant is not.

7              In terms of the weight of the evidence, I have touched

8    on that.  But again, you know, you are not going to have some

9    defense lawyer get up and say, yeah, the government is right,

10   their evidence is overwhelming.  I don't believe that and I am

11   not through all the discovery.

12             But based on what I know, if we make that determination

13   in the future, then I suppose we will file a Notice of

14   Disposition, but at this point I am not prepared to concede that

15   and obviously I take great issue with that.

16             In terms of Mr. Armstrong's history and

17   characteristics.  He is, as I said, 76 years old, devoid of any

18   criminal history, your Honor.  Any criminal history.  In other

19   words, on the one hand the government argues potentially in

20   Agent Flynn's declaration this guy doesn't like the government,

21   this guy is anti-government.  He can't be trusted.

22             He has walked this earth for 75 years and he hasn't

23   picked up a criminal case.  He has a driver's license.  He has a

24   passport.  Now, the government makes issue, and you will see in

25   the transcript, well, he wants it both ways.  On the one hand he

1    rejects the sovereignty of the United States government, and on

2    the other hand when he wants a pilot's license or he wants to go

3    to Mexico he is happy to walk around with a U.S. passport.

4         Frankly, your Honor, that is irrelevant.  It's his

5    absolute First Amendment right to believe what he wishes to

6    believe so far as that goes.  Now if that leads to criminal acts

7    that's a different thing.  But none of his beliefs presented or

8    averred by the government are seditious, are illegal, are

9    criminal, and Mr. Harmon says actions speak louder than words.

10   He has filed his income taxes.  He may disagree with the

11   government's sovereignty.  He may file papers suggesting to the

12   government that they don't have sovereignty.

13        The Internet and the world, as I am coming to find out,

14   is replete with people who disagree and have very divergent

15   views about the IRS.  But this is not a case, a so-called tax

16   protester case, where people are not filing their taxes and not

17   obtaining driver's licenses and not carrying around I.D. and not

18   allowing authorities to talk to them.  That's just not his

19   history.

20        In the declaration the agent says, well, he is fighting

21   the IRS.  The IRS has filed civil liens on his property.  From

22   my perspective that's called exercising your due process rights.

23        Those cases are pending.  He is a U.S. citizen and has

24   every right to exercise his legal right and to put the

25   government to their proof on the civil side.

1          So the fact that he has been confessed the liens, or

2    whatever one does with liens, I am not that kind of lawyer,

3    certainly shouldn't be a mark against him.  It's irrelevant.

4    And it certainly does not allow the court to draw the conclusion

5    the government wishes, which is that this man is not amenable to

6    government oversight.

7          There is lots of things all of us don't like about the

8    government but we are still amenable and subject to government

9    oversight, and Mr. Armstrong is no different, and more

10   importantly, your Honor, he has lived his life no differently.

11         He has a pilot's license, he has a driver's license, he

12   has a passport.  He does things the way you are supposed to do

13   things.

14         Now the government says, no, he doesn't, he used a

15   shell company, he has LLCs.  His belief and how he goes about

16   listing his assets will be subject to trial but this court well

17   knows from its civil experience that in and of itself, companies

18   and LLCs and LLPs, and PCs, and asset protections are not in and

19   of themselves problematic unless they are illegal, and the

20   government has yet to prove beyond a reasonable doubt that this

21   was illegal.

22         The government talks about Mexico.  We can argue about

23   that.  I mean he doesn't own a home in fee simple.  Apparently

24   under Mexican law American citizens cannot own land in fee

25   simple.  Yes, he has gone to Mexico and rented a property for

1   ten years.

2           To this day I don't understand the nefariousness of

3   that action.  Neither he nor his wife, until Mr. Armstrong was

4   arrested on May the 20th of this year, were ever under any kind

5   of restriction that would not allow them to travel to Mexico.

6           He didn't have a home in Kazakhstan or Iran or

7   Afghanistan or someplace, or North Korea or someplace that the

8   U.S. doesn't have relations with or that retired people don't

9   commonly go to.

10          The guy went to Mexico for the winter every year like

11  hundreds of thousands of people in the western United States.

12  That is not nefarious.  Yes, his wife has a business.  It's a

13  nascent business.  She doesn't sell too much real estate in Cabo

14  San Lucas.

15          The only real connection is a picture of Mr. Armstrong

16  and his wife and a stuffed Blue Marlin on the web site.  That's

17  not a crime.  It might be a crime in taste, but it's not a crime

18  under our laws, and I don't think under Mexico's laws.

19          There is an interesting assumption, your Honor, that he

20  will go back, he will flee.  He will go to Mexico.  By the way,

21  they haven't established that he speaks or understands Spanish.

22  He will go back to the very place they know where he is.  I

23  don't know how logical that is.

24          But the point is, if he goes to Mexico, there is an

25  extradition treaty with Mexico.  People are extradited from

1    Mexico all the time.  I am not for a second suggesting that he

2    is going to flee and they can easily bring him back.  I am

3    simply saying this isn't a situation by the logic of their own

4    argument where he would be beyond the reach of U.S. law

5    enforcement authorities.  Quite the opposite.  Again, based only

6    on my very limited experience.

7            They make a big deal, well, Mrs. Armstrong is going to

8    Mexico.  Listen to the tapes, and Mrs. Armstrong is going to

9    Mexico.  Mrs. Armstrong can go anywhere she wants.  She has a

10   passport.  She is not charged.  She is not an unindicted

11   coconspirator.  She hasn't been informed even that she is a

12   target of the criminal investigation.  That's a red herring.

13   That woman can do anything she wants and go anywhere she wants,

14   and the fact that she wants to go back to the place where they

15   say she has a business and a life, that's her, that's not

16   Mr. Armstrong.  And the court well knows that when restrictions

17   are placed upon criminal defendants, that's who the restrictions

18   are placed upon.

19           So they would have a decision, honey, see, you know, go

20   to Mexico and do what you want but I can't go or stay with me.

21   That's their problem.  That has nothing to do with you

22   determining whether he is a risk of flight.

23           The pilot's license is really frankly I don't think a

24   big deal at this point but for the court's information here is

25   the pilot's license.  I didn't mark it because we would submit

1      it to the custody of the court.  And that is that issue.

2             The passport, I am not exactly sure where it is.  But I

3      know it's in government custody.  I believe it's at the clerk's

4      in California or maybe it's with law enforcement.  We don't have

5      it.  Obviously enough we don't expect to be maintaining it while

6      this case is pending.

7             The finances, your Honor, you know, that's going to be

8      a lot of the fight in this case as well.  When the court looks

9      at the transcript, it's really discussed from approximately page

10     50 to approximately page 56 or 57.

11            And the government goes through a bunch of math, but

12     the bottom line is the allegations are that Mr. Armstrong got

13     $1,637,000 and change.  The government then goes through and

14     figures out where some of that money went.  For instance, you

15     will see 600,000 went to buy a house in Brighton, Colorado.  He

16     doesn't live in that house, by the way.  But we have looked at

17     that.  The government accounts for approximately $1,454,500,

18     leaving as of 18 months ago, $182,000, quote, unquote,

19     unaccounted for.

20            The government talks about Belize and getting money

21     from Belize.  The fact of that matter, your Honor, is that was a

22     line of credit, and unfortunately that was one of the things I

23     was trying to, quote, unquote, paper for purposes of this

24     hearing, but I can't do that because my client couldn't have

25     access to on-line records and couldn't locate, obviously

1    couldn't go to his house and get me those records.

2              But upon information and belief, that is -- there was

3    money came back paying down that line of credit and there was

4    money from Belize to the Armstrongs.  It was on a line of

5    credit.  That is in the category of sort of is what it is.

6              I don't think either side has full clarity as to the --

7    the assets, the full picture of the assets, but right now I

8    don't believe the government can tie him to funds that are at --

9    that were ready, willing and at his disposal offshore.

10             The government makes suppositions the money was sent

11   offshore.  We don't know where it was.  This guy travels to

12   Mexico therefore he will be able to get the money.  Those may be

13   logical but they are suppositions.  They are inferences.  They

14   have not tied him to those accounts.  They have not established

15   control by either he or his wife.

16             In terms of the ability to be supervised in Arizona,

17   your Honor, I don't really think that frankly that's a huge

18   deal.  But we also have reached out to federal probation

19   authorities in the state of Arizona.  Mr. Knierim talked with a

20   supervisor in Yuma by the name of Joe Houston.  Yuma supervises

21   both Lake Havasu.  And a woman named Doris in Flagstaff covers

22   Prescott.  And the bottom line is they have the ability to cover

23   people -- to supervise people via electronic home monitoring.

24   They have done it and they could do it here.

25             Again, we are into sort of a land of supposition.  If

1    he slips the thing and he jumps on a motorcycle and runs for the

2    border, and the local sheriff is asleep and he gets a phone

3    call, God willing he wakes up from his slumber, and jumps in the

4    police car.  It's not a Tom Cruise movie.  This is reality.

5           And the bottom line is I know the court and the

6    government and certainly I very much appreciate and respect the

7    work of pretrial and the probation department.  I don't think

8    there is anything unique to this case to suggest that he is not

9    supervisable in Prescott, Arizona.

10          Now, granted, they don't have a probation office in

11   Prescott, Arizona.  But this district we don't have a probation

12   office in lots of places and people are supervised all the time.

13   So frankly, with due respect to Mr. Harmon, I think that's a bit

14   of a side issue also.

15          What we are left then with is are there -- frankly a

16   combination of conditions.  There has got to be a combination of

17   conditions that will reasonably assure Mr. Armstrong's ongoing

18   participation in this case.

19          I have I hope not presumptuously suggested some.  I

20   will tell the court what I told Mr. Harmon and that is, your

21   Honor, we are amenable to anything.

22          We are amenable to being put on as short a leash as

23   this court believes is practical, necessary, whatever will give

24   this court whatever comfort this court needs, and curfew is an

25   idea.  House arrest is an idea.  Electronic home monitoring is

an idea.

I will be frank with the court, as I try always to be, and say two things, though.  No. 1, a large cash bond is a bit of a Pyrrhic victory from where I stand right now.  This gentleman has filled out a financial affidavit.  He has been appointed CJA counsel.  They are aware of his bank accounts.  The bank accounts don't show a lot of money.

These reported conversations, frankly they are quite mundane, much of it.  Half of them, it seems, are Mr. Armstrong's concern that Mrs. Armstrong find $50 to pay for a calling card so he can continue to call.  And I chuckled a little bit to myself because they spent about half their time and their present calling card talking about how they are going to pay for the next calling card.

Now, the government can say, well, this is a diabolical scheme and people that are anti-government work very hard to portray a veneer of no assets when in fact they have lots of money tucked away and he knows these calls are being recorded so therefore this is an act in furtherance of this diabolical scheme.

I mean the court can listen and the court can take whatever inferences it wants.  The bottom line is you have got two people who are trying to rub enough nickels together to get this gentleman a calling card so they can talk about the mundane realities of Mrs. Armstrong having to figure out what she needs

1    to do to take care of her day-to-day financial needs.  She talks

2    about a cancer diagnosis on those tapes.  These are people who

3    are trying to figure out just how to get by while this case is

4    pending.

5            So we are amenable, your Honor, to do whatever it

6    takes.  But I would request that the court consider that one of

7    these conditions not be a big cash bond because I just don't

8    think as a practical matter is a bit of winning the battle and

9    losing the war I think.

10           And the second thing, your Honor, obviously I would

11   rather him be out than in the Federal Detention Center for him

12   and for my ability to defend him.  The reality is this case is

13   going to be around for a while and it is my request and my hope

14   that were you to fashion conditions, that those conditions would

15   be allow him to move back home, which is in the District of

16   Arizona.

17           Yes, a halfway house in Colorado is preferrable to the

18   FDC in Englewood, but that's a bit of a Pyrrhic victory also in

19   terms of my earlier comments about his ability to defend himself

20   and assist his legal team in defending himself.

21           So I would respectfully argue, your Honor, that there

22   are combinations of conditions that will reasonably assure his

23   appearance.  That given all the 3142 factors that are applicable

24   in this case this court would have a legal basis for fashioning

25   whatever conditions are necessary, and I would ask the court and

1    respectfully urge the court to think about doing that either

2    today or at an appropriate point.  Thank you for your patience,

3    your Honor.

4            THE COURT:  Counsel, thank you.

5            Rebuttal by Mr. Harmon.

6            MR. HARMON:  Thank you.  You are very kind.  I do not

7    wish to try the court's patience with any further extended

8    argument, but with the court's permission just a couple of

9    points.

10           If the court has any doubt about the defendant's

11   financial wherewithal, then I would suggest the court should

12   listen to these tape-recordings.  I did, and I stopped at a

13   certain point on that particular point because it was fairly

14   evident from one of the first conversations that I heard what

15   exactly was going on.

16           The agent basically looking at the financial records

17   that the defense now has has been able to show that money went

18   to banks in Belize and money came from banks in Belize back to

19   the United States in this defendant's account.

20           One of the first recorded conversations in prison

21   between this married couple is this.  And looking at the agent's

22   transcript, it's a paraphrase not official, but one of the first

23   conversations. Mrs. Armstrong:  They know about Belize, you know

24   that.  Mr. Armstrong:  Well, I don't care if they know about it

25   or not.  They can do, and I will use a term from the Nixonian

1    days, expletive deleted they can do expletive deleted thing

2    about it.  They can't do a expletive deleted thing about Belize.

3    And Mrs. Armstrong says, well, I don't know how to do anything

4    about it either.  And they do have a discussion about how

5    Mrs. Armstrong figuratively does not have the keys to the safe.

6    Does not know how to get the money out of Belize.  They talk

7    about how you have to go about doing a loan, and Mr. Armstrong

8    says he is going to walk her through at some point the process

9    of requesting a loan.

10         Why do you request a loan?  Agent Flynn discusses that

11   in his declaration.  That is part of the *modus operandi* for

12   these offshore asset protection schemes.  You put your money

13   with the financial institutions and it looks like they have the

14   money and then you borrow the money back.  So it's perfectly

15   consistent.

16         But if the court has any question that there is

17   financial wherewithal that this defendant has that he hasn't

18   told the court about I would suggest listening to the tapes and

19   you will see it in the first couple of minutes of recorded

20   conversation.

21         And that gets to my second point which is what does the

22   defendant believe and what is he saying about government

23   authority.  Mr. Kornfeld tasked this as First Amendment

24   expression.  I think of it as part of the subject of respect for

25   the court and respect for an obligation the court may consider

1    in this undertaking.

2           Because what the court is considering here basically is

3    a bond.  And a bond, as we all know, the derivation is it's a

4    synonym for a promise.  And all the conditions that this court

5    can fashion will not get away from the common-sense bottom line

6    irreducible proposition that you will have to have this man's

7    word that he is going to follow his obligations to the court.

8           So I think it's very telling what his words and his

9    actions are, even if he is allowed to talk about how the

10   government -- he shouldn't be obligated to government authority.

11          If you take a look at how he deals with the IRS and how

12   he deals with these obligations it can give you some insight how

13   he may deal with this court and this court's authority.

14          When he files written documents saying he is not a

15   citizen of the United States but a private sovereign and he is

16   not subject to the federal government's authority the court can

17   take heedence with that.  The court's ears can perk up.

18          That's a common-sense basic assessment about whether

19   this man is going to follow his word if he is released.  Whether

20   he will basically respect this court's authority.

21          So I mention that in juxtaposition with these calls,

22   you know, about what this man is hiding, what he is telling the

23   court.  Because his first opportunity to tell the court that he

24   is deserving of its respect and its deference and its

25   willingness to allow him out on conditions is what he tells the

1    probation office as a proxy report.  And the court has one

2    report.  There is nothing about anything in Belize.  There is

3    nothing about any of this stuff.  These are things that had to

4    be ferreted out by the government.

5           A couple of very small points.  The Mexican residence,

6    I think Mr. Kornfeld is right.  American citizens cannot own in

7    fee simple.  I think what you will find here when you see all

8    the evidence, review all the evidence, is that the defendant has

9    a long-term lease, and in effect it functions as ownership and

10   it is consistent with what the defendant is telling you later

11   when he tries to buy his airplane that he does in fact own this

12   residence and he actually puts a value to it.  It's in

13   Government's Exhibit 1, the financial statement that he provided

14   to his land group.

15          Mr. Kornfeld says ultimately we don't know what the

16   future is and has in store, and by the way the government can

17   only seek extradition because if the government's theory is

18   correct, he will just go back to where the government believes

19   he will be.  But Agent Flynn will probably know where to look

20   for him but Agent Flynn can't get on an airplane or get in a car

21   and drive across the border and put cuffs on him.  He has to go

22   through legal process and we have to go through extradition

23   which is what Mr. Kornfeld has acknowledged.

24          I have not looked up this issue for today but I will

25   tell you on my experience, and I think Mr. Kornfeld's experience

1      will confirm this, is that that condition is a selected process

2      that is a result of mutual legal assistance agreements worked

3      out between nations.

4            That is not only the case, in fact it is often not the

5      case, that on a tax offense one country will extradite for that

6      type of an offense.

7            So I don't think it's clear at this point that

8      condition is a tool that the government can use to ultimately

9      get this defendant to honor his obligations, and I don't even

10     think we should be going there.  If the court thinks there is a

11     chance that we would have to or a decent chance that we would

12     have to resort to extradition, then we shouldn't be talking

13     about release on conditions.

14           I think that basically covers my points except to say

15     two last things.  I asked Agent Flynn where the passport was

16     because one of the things I wanted to find out is I wanted to

17     look at those stamps and find out where the defendant has been.

18     Agent Flynn doesn't have that passport.  The IRS doesn't have

19     that passport.  I don't know if pretrial services has it or not.

20     Mr. Williams can answer for that.

21           THE PROBATION OFFICER:  Our office doesn't have it.

22           MR. HARMON:  Then what may have happened is this.  I am

23     hoping it's back in California.  But I think that the United

24     States Court would be forwarding -- in California would be

25     forwarding all of that here.

1          I don't know if that passport is with the airplane

2     logs.  There were airplane logs on this airplane that were

3     supposed to be turned over as part of the seizure of this

4     airplane.

5          The last person on that airplane, the last person that

6     had physical possession of those airplane logs was

7     Mrs. Armstrong, and I don't know if that passport is there or

8     not.  And maybe it will be surrendered.  I know the court can

9     make it a condition it has to be surrendered but that's the

10    response to the question of where is the passport.  We don't

11    know.  We have no idea where it is.

12         And then the final point I wanted to make is

13    Mr. Morris, the codefendant, yes, he was released.  He doesn't

14    have a residence in Mexico.  He doesn't have money that we have

15    been able to show is offshore.

16         And notwithstanding that, he was released on home

17    detention.  He is under curfew.  Home detention and electronic

18    monitoring.  So it's not an OR bond.  It's not a personal

19    recognizance bond at all.

20         It's some of the most Draconian conditions that you can

21    impose on someone who does not have the same type of situation

22    that Mr. Armstrong has.  His case does not present offshore

23    assets and his case did not present residence abroad and did not

24    present all these other things.

25         And even so, even though they are not similarly

1    situated, that was the release conditions that the court imposed

2    on Mr. Morris.  That's basically the release conditions that the

3    defense wants this court to impose on Mr. Armstrong.

4          THE COURT:  Counsel, thank you.  Now while I have you

5    as a captive audience, I want to revisit the setting, the late

6    October setting on the defendant's Joint Unopposed Motion for

7    Declaration of Complexity and to Exclude Time under the Speedy

8    Trial Act.

9          I want to expedite the court's hearing and

10   consideration of that joint motion, and if you have your

11   calendars let's discuss the intent of that.

12         MR. KORNFELD:  That's fine, your Honor.  And also for

13   the court's information we had shared some concern and Ms. Wayne

14   too, and I think all the counsel were in agreement that upon the

15   filing of that motion and the court making this setting that the

16   time was excludable, so I don't think that's an issue.  But we

17   do have our calendars.  Obviously Ms. Wayne, I don't have her

18   calendar.

19         THE COURT:  Good point.  What I am likely to do is

20   schedule through my administrative assistant another telephonic

21   setting to discuss a more expeditious hearing for that motion

22   than that October 22 setting.

23         But I would agree that under current Tenth Circuit

24   precedent *Williams* and *Toombs*, the time between the filing of

25   the motion and the time of the hearing, at least for now, is

1    excludable from the computation of time for a speedy trial under

2    the Speedy Trial Act.

3            Nevertheless, in my own review of the case it simply

4    strikes me as too long between the date of the filing and the

5    date of the hearing.

6            The court's calendar has changed or relaxed somewhat,

7    and I am in a position to offer one or more earlier settings,

8    which I intend to do.

9            MR. KORNFELD:  Thank you, your Honor.

10            THE COURT:  Very well.  Is there further business

11    before the court in this case concerning this defendant on the

12    discrete motion now before the court by the government?

13            MR. HARMON:  No.  Thank you, your Honor.

14            THE COURT:  Or by the defendant?

15            MR. KORNFELD:  Your Honor, just two points.  One with

16    the passport.  I don't know where that passport is either but I

17    believe it to be in the custody of some law enforcement official

18    because when the Armstrongs landed at this airport that is

19    referenced in the transcript and presented their passports,

20    that's what created the issue.  So as an officer of the court I

21    will tell you I don't know where it is but I don't believe we

22    have it.

23            The second issue is what I do have is this pilot's

24    license, and I don't know if the court wants me to submit it now

25    to hold on to it, to make it an exhibit.  I am at the court's

1    pleasure on this issue.

2            THE COURT:  I think you can hold it for now.  The court

3    is really ill equipped to hold it with any more security than

4    the defense.

5            If the court grants the motion or the thrust of your

6    motion and releases the defendant with bail and subject to

7    conditions of bond, two obvious conditions of bond will be the

8    surrender of the pilot's license and the surrender of the

9    passport.

10           And those, of course, will become conditions precedent

11   to his physical release and discharge.  So at that point the

12   defendant next would have every incentive, of course, to locate

13   those documents and get them to the clerk with all expedition.

14           MR. KORNFELD:  Very well, your Honor.  Thank you.

15           THE COURT:  You are welcome.  A special thanks to these

16   Deputy United States Marshals present and assisting the court.

17   Men, good morning and thank you.

18           For now, please close the record in this case.  You

19   will have the benefit of the court's ruling as soon as

20   practicable.

21           (Proceedings concluded at 11:10 a.m.)

22                      REPORTER'S CERTIFICATE
         I certify that the foregoing is a correct transcript
23   from the record of proceedings in the above-entitled matter.
                 Dated at Denver, Colorado, this 31st day of August,
24   2010.
                                   s/Suzanne M. Claar
25