# NON NEGOTIABLE NOTICE
# OF ACCEPTANCE

NOTICE DATE: Day Ten           Month Twelve           Year 2013 C.E.

Clerk of the Court
U.S. District Court
901 19th Street, Room A-105
Denver, CO 80294-3589

**In reply to:** "Case 1:10-cr-00317-REB Document 48 Filed 07/17/10 USDC Colorado Page 1 of 101, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, Page 101 of 101 Adrianne Whitlow"

**PLEASE TAKE NOTICE** that I, Richard Kellogg Armstrong, sentient moral being accept for value your Presentment "supra" and return your offer for closure and settlement of the accounting.  I request you issue me the Order of the Court.

I indicate my acceptance of your offer by my signature and date.

- I do not argue any facts in this case;
- I request you issue me the Appearance Bond and waive all Public costs;
- I request you close Account Number 1:10-cr-00317-REB, and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public charges by the exemption in accord with Public Policy;
- I request discharge.

PLease respond within three (3) days of your receipt of this **NON NEGOTIABLE NOTICE OF ACCEPTANCE**.  Dishonor may result if you fail to respond.

### FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

DEC 1 3 2013

JEFFREY P. COLWELL
CLERK

Sincerely,

*Richard Kellogg Armstrong*
Richard Kellogg Armstrong
c/o 20413-298
Federal Correctional
Institution - Lompoc
3600 Guard Road
Lompoc, California

Attachment: "supra"
cc: Robert E. Blackburn, United States District Judge U.S. District Court 901 19th Street Denver, CO 80294-3589
cc: U.S. District Court 901 19th Street Denver, CO 80294-3589

#### CERTIFICATE OF MAILING

I, Richard Kellog Armstrong, certify this **NON NEGOTIABLE NOTICE OF ACCEPTANCE** was sealed in an envelope with First Class Postage paid and deposited in a United States Postal Mail Box located in Unit J at FCI Lompoc 3600 Guard Road Lompoc, California on December 10, 2013 C.E. for same day delivery to Clerk of the Court U.S. District Court 901 19th Street, Room A-105 Denver, CO 80294-3589.

*Richard Kellogg Armstrong*
Richard Kellogg Armstrong

NON NEGOTIABLE
NOTICE OF ACCEPTANCE

NNNOA

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C.E.*
1

1       IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
2
        Case No. 10-cr-00317-REB
3
        UNITED STATES OF AMERICA,
4
        Plaintiff,
5
        vs.
6
        RICHARD KELLOGG ARMSTRONG,
7
        Defendant.
8

9       _____

                    REPORTER'S TRANSCRIPT
10         Arraignment, Discovery and Detention Hearing

11      _____

12              Proceedings before MAGISTRATE JUDGE
        KATHLEEN M. TAFOYA, United States Magistrate Judge for
13      the District of Colorado, commencing at 3:36 p.m. on
        June 21, 2010, in Courtroom C205, United States
14      Courthouse, Denver, Colorado.

15                  A P P E A R A N C E S

16      FOR THE PLAINTIFF:
        KENNETH M. HARMON, AUSA, U.S. Attorney's Office,
17      1225 17th Street, Suite 700 Denver, CO 80202.

18      FOR THE DEFENDANT:
        RICHARD K. KORNFELD, Recht & Kornfeld, P.C., 1600
19      Stout Street, Suite 1000, Denver, CO 80202.

20

21

22

23

24
              Proceedings Recorded by Electronic Sound Recording;
25              Transcript Produced by Transcription Service

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.

```
1                    P R O C E E D I N G S
2          (In open court at 3:36 p.m.)
3                  THE COURT:  And, Mr. Harmon, while
4    you're here, I think the next one we'll take up is Mr.
5    Armstrong.  So, again, Case No. 10-cr-317, United
6    States of America v. Richard Armstrong.
7                  MR. KORNFELD:  Good afternoon, your
8    Honor.  Rick Kornfeld on behalf of Mr. Armstrong.  He
9    is here in custody at my side.  I've been appointed
10   pursuant to the CJA.
11                 THE COURT:  Thank you.  We are here for
12   Mr. Armstrong for an arrangement, a discovery
13   conference and a detention hearing.  Are you prepared
14   to go forward with arraignment at this time?
15                 MR. KORNFELD:  Yes, your Honor.
16                 THE COURT:  Do you need to have the
17   Indictment read?
18                 MR. KORNFELD:  No.  Your Honor, we would
19   acknowledge receipt of the Indictment, waive any
20   further advisement, formal reading, and enter a plea
21   of not guilty to all counts.
22                 THE COURT:  All right.  The not guilty
23   plea will be entered to all counts to which Mr.
24   Armstrong is charged.
25                 We have the Discovery Conference
```

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C.E.*

1    Memorandum here filled out by both of you.  I'll give

2    you your speedy trial dates.  The 30-day date is July

3    16, 2010; the 70-day date is August 21st, 2010; and

4    the 90-day date, if it's needed, is September 10th,

5    2010.  Should we put in the same discovery dates, Mr.

6    Harmon?

7              MR. HARMON:  Yes, please.

8              THE COURT:  July 6th and 7th?

9              MR. HARMON:  Yes.

10             MR. KORNFELD:  July 19th for us, your

11   Honor.

12             THE COURT:  All right.  It's always

13   helpful if all of you go to Judge Blackburn together.

14             MR. KORNFELD:  Yes.

15             THE COURT:  All right.  So that leaves

16   us on the issue of bond or detention.  What's the

17   government's position?

18             MR. HARMON:  Your Honor, our position is

19   that we've persisted in the view that detention is

20   warranted in this case.  I would say, I'm making a

21   request, but actually to be procedurally precise,

22   there has been a detention hearing held, and the

23   defendant was represented by counsel in the Central

24   District -- excuse me -- the Southern District of

25   California, and findings, written findings were made

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C.E.*

1    at that time with leave for the defendant to reopen.

2    And that was something that Judge Boland acknowledged

3    twice, I think, last week when Mr. Armstrong was

4    before him.  And what Judge Boland thought was the

5    right procedure was to allow the defendant to reopen

6    on motion.  And I don't think that motion needs to be

7    a written motion, but basically the government had

8    laid out a case, and a magistrate judge in the

9    Southern District did find that the detention request

10   was warranted and that there was a preponderance that

11   a risk of flight was established by a preponderance.

12              The judge did say that the District of

13   Colorado is best suited to determine if there are any

14   conditions of release, and so that order was entered

15   without prejudice, and for that reason I believe Judge

16   Boland acknowledged, and I don't have any opposition

17   to allowing Mr. Kornfeld to reopen on an oral motion.

18   I'm prepared to support the detention finding of the

19   magistrate judge in the Southern District of

20   California with Evans from the case agent.  So I'm

21   prepared for a hearing, but that's procedurally the

22   way it's been set up.

23              THE COURT:  Well, I don't think you have

24   a right to a second detention order.  You make that

25   decision when you're arrested in the opposing

"ACCEPTED"
*Richard Kellogg Armstrong*
DECEMBER 10, 2013 C.E.
5

 1    district, and if you make the decision to have your

 2    detention hearing, then don't you think you have to

 3    have good cause or new evidence or something to come

 4    before the Court again?

 5              MR. KORNFELD:  Well, I think in general

 6    that's true, your Honor.  I think you do need to have

 7    new evidence.  I believe that, by way of proffer, you

 8    know, I'm flying a little blind here, and I think we

 9    all are because I haven't seen a transcript of that

10    detention hearing.  I've only seen it in this Court's

11    Docket No. 8, the same order that Mr. Harmon's seen

12    and that the Court has seen.  So I'm not exactly sure

13    what evidence was set forth other than what's

14    referenced here.

15              Also, with due respect to the Court in

16    California, I think it's a little muddled only in the

17    sense that there's almost an invitation at page 3 of

18    the Court's order, Roman numeral II(c), for this Court

19    to revisit, because the Court in California indicates

20    that this Court is, quote, unquote, best suited to

21    determine if there are any conditions or

22    combinations.  And I'm happy to do it, obviously, with

23    leave of the Court any way the Court wishes.  To be

24    quite honest with you, your Honor, I think the issue

25    is whether there are a combination of conditions.  And

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.

1    I'm prepared to discuss that.

2              There are some factual issues that we

3    would take issue with, and if Mr. Harmon wants to go

4    forth on those issues; and more specifically, what I'm

5    referring to is the defendant's alleged owning of

6    property in Mexico and also the defendant's alleged

7    wire transferring of money overseas.  We do take

8    issues with that.  But be that as it may, the focus of

9    my argument, if I'm allowed to make my detention

10   argument, is that there are conditions -- well, there

11   are combinations of conditions that I would like the

12   Court to consider.

13             So in that respect, and frankly, that's

14   muddled, also, because some of the possible conditions

15   I don't think were put forth as facts before the court

16   in California.  So I'm at the Court's whim, however

17   the Court wishes to proceed.

18             THE COURT:  Well, you don't have any

19   objection to proceeding procedurally if it factually

20   is an appeal, basically, or a review of the detention

21   order in Southern California.

22             MR. HARMON:  I have no opposition to Mr.

23   Kornfeld moving orally to open it up and to giving a

24   proffer, just like the defense counsel just did on the

25   prior case, giving a proffer of what conditions he

*" ACCEPTED "*

*Richard Kidenz Armstrong*

*DECEMBER 10, 2013 C.E.*

1     thinks would warrant release and making his argument.

2     And I will say that I'd be prepared, and I would be

3     most comfortable supporting the detention order by

4     fully setting out my case with evidence.  And I've got

5     the case agent here, and I'm prepared to do that.

6     It's just a matter of kind of like the order in which

7     to do it.

8            THE COURT:  Well, I actually haven't

9     read this order.  I guess I was just not -- I didn't

10    realize that was the posture of the case, so I didn't

11    read it.  So if you want to present evidence on your

12    case, that's fine.  We can go ahead.  I don't know

13    what your evidence is because I haven't read what's

14    in the report, or I can sit here and read it.

15           MR. HARMON:  Well, I'd like to present

16    evidence, but I don't want to do it in a vacuum.  I

17    think I'd like to hear Mr. Kornfeld make his proffer,

18    and maybe it will make my presentation more

19    streamlined than if we were just making a request and

20    we didn't know what the defense was offering, in which

21    case we'd lay out everything.

22           Now, I'm not going to promise the Court

23    I'm still not going to lay out everything, but there's

24    a chance we can be a little bit more refined in our

25    presentation, since we are not at the point where

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 & E.

1    we're actually reopening it.

2              MR. KORNFELD:  And I appreciate the

3    courtesies of allowing me to make the oral motion, so

4    I guess I will formally do that right now, and I'm

5    comfortable.  I mean, the case is just an unusual

6    procedure compared to your typical detention hearing

7    of first impression, so I'm happy to make that

8    proffer, and I will confine, obviously without waiving

9    my ability to cross-examine the case agent, if that

10   comes to pass.  I'll confine my proffer and my

11   comments to the issue of potential combination of

12   conditions.

13             THE COURT:  All right.  And conditions

14   that were not considered, or facts that were not

15   considered, your new evidence at this point?

16             MR. KORNFELD:  Sure.  The first thing,

17   your Honor, and there is a bit of a vacuum, but I

18   would refer the Court and counsel to page 3 of the

19   report -- excuse me -- of the Court's order.  At the

20   beginning it talks about the characteristics.  He is,

21   in fact, at (c)(1), a U.S. citizen, and he has a home

22   and resides in Lake Havasu City, Arizona, and also in

23   Prescott, Arizona, your Honor.  He's been a resident

24   there approximately 20 years.

25             It indicates at (3) that he owns a home

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013  C.E.*

9

1    or has a home in Cabo San Lucas.  I would proffer to

2    the Court that he has rented on a seasonal basis what

3    is in effect, I believe, a mobile home.

4              UNIDENTIFIED SPEAKER:  It's a forty-five

5    year old mobile home on Mexican leased land.

6              MR. KORNFELD:  Okay.  But that he and

7    his wife, in fact, do not own the property in the

8    country of Mexico.

9              At (4), your Honor, the defendant is, in

10   fact, a licensed pilot, and that is true.  We would be

11   willing, as a condition of any bond, to surrender that

12   pilot's license.  As the Court may well know, I'm sure

13   the government knows, in order to file a flight plan,

14   in order to operate a plane either domestically or

15   outside of U.S. air space, a pilot has to file a

16   flight plan with the FAA and has to establish that

17   they are, in fact, not only a licensed pilot, but

18   licensed on particular instrumentation and a

19   particular aircraft.  We would be willing, of course,

20   to give up that license, essentially surrender it akin

21   to surrendering a passport, not to give it up in

22   perpetuity, but to give it up, and without that

23   license he cannot get behind the controls of a plane.

24              We also, and I don't know if this is

25   before the Court or not.  He was arrested upon flying

"ACCEPTED"
*Richard Kellogg Armstrong*
DECEMBER 10, 2013 C.E.

10

1    back to the United States from Mexico to attend his

2    forty-eight year old son's funeral.  Forty-eight year

3    old son recently died of cancer.  He was arrested when

4    he presented his passport.  He does not have his

5    passport now.  I don't know if it's been formally

6    surrendered to the Court in the Southern District of

7    California; but as a condition, of course, of any

8    release order, we would be willing to surrender that

9    passport here at the District Court in Colorado or if,

10   in fact, it's surrendered in California, to keep it

11   there, we don't really care, but to ensure that he

12   cannot leave the United States.  And again, as I know

13   the Court and counsel well know, you cannot anymore go

14   to Mexico as a U.S. citizen without a valid U.S.

15   passport.

16           Your Honor, with respect to this

17   allegation that money has been sent internationally,

18   I'm not aware of the government's evidence.  I did

19   discuss this briefly with my client, and he indicates

20   that that is inaccurate, so we take some issue with

21   that.

22           Another new fact, I think is, as I

23   indicated, this gentleman recently lost his son.  He

24   had two sons, one of whom is still alive and lives in

25   Nevada.  He has three grandchildren.  The other son

"ACCEPTED"

*Richard Kellogg (signature)*

*DECEMBER 10, 2013 (initials)*

11

```
 1    recently passed.  He was not allowed to go to the

 2    funeral.  His family is in obviously a period of

 3    bereavement, and we believe that that's a fact, given

 4    his lack of criminal history, his age, the nature of

 5    this offense, the fact that there isn't a presumption

 6    of detention that is a fact that the Court I would ask

 7    to take into consideration as it affects his history

 8    and characteristics.  His present characteristic is

 9    significant, having just lost his son to a terrible

10    illness, and quite frankly the bereavement process

11    exacerbated by the fact that he was in custody during

12    the funeral.

13              The other thing, your Honor, and maybe

14    it's moot at this point because there was a detention

15    hearing, but the only Pretrial Services Report that

16    all of us, I think, have been provided was the

17    original one out of California, and I recognize that

18    additional evidence was proffered before the

19    magistrate judge in the Southern District, but it's

20    at least worth noting that in the opinion of that

21    Pretrial Services officer, this defendant does not

22    pose a risk of flight.

23              Additionally, your Honor, I would

24    indicate to the Court, having discussed this issue

25    with Mr. Armstrong, Mr. Armstrong also is willing to
```

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.

12

1    be monitored via electronic home monitoring, via

2    curfew, or via any type of way to sort of restrict his

3    movements.  Obviously, it's our intention if he is

4    released that he be released to the District of

5    Arizona.  I frankly don't know if there are multiple

6    districts in Arizona, but whichever district has

7    jurisdiction over Prescott, Arizona.

8              This case is voluminous in its nature in

9    terms of discovery.  I've been informed by the case

10   agent that it's approximately ten boxes of documents,

11   as well as computers that were mirror imaged after

12   they were seized at a search warrant at the

13   codefendants.

14             Mr. Armstrong has additional

15   documentation that I believe is relevant to my defense

16   of him.  That documentation is located at his home in

17   Arizona, and it's vitally important in terms of his

18   rights and ability to defend himself and my ability to

19   render effective assistance of counsel, hopefully,

20   that he have access to it.

21             And finally, your Honor, his health is

22   reported in the Presentence Report as being fair.  He

23   indicates to me that at age 76 he is not on any

24   medication on a constant basis or an ongoing basis, so

25   I am not indicating to the Court that health right now

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C.E.*

13

1    is a factor.  However, I think it's fair to say that

2    for any 76 year old, and for anyone of any age, the

3    federal detention center or any equivalent detention

4    center is probably not a positive factor on one's

5    health.  And given that this case very well may be

6    declared complex, given the nature of it as a fraud

7    case, as well as the volume of discovery, I have very,

8    very serious concerns about my defendant's -- excuse

9    me, my client's ongoing health and his prospects for

10   his ongoing physical and mental health going forward

11   should he be detained pending trial in this matter.

12   So I would also ask the Court to take that factor into

13   account.  I don't believe that was articulated before

14   the court in California.

15                 I appreciate the Court's indulgence in

16   letting me make these points with respect to the

17   defendant.

18                 THE COURT:  All right.  Well, on your

19   oral motions to have this Court reconsider the prior

20   detention order, I will find that you made a

21   sufficient showing to reconsider, and then we can go

22   forward.

23                 MR. KORNFELD:  Thank you, your Honor.

24                 THE COURT:  So Mr. Harmon, I think you

25   have the proffer, so you may proceed however you want

"ACCEPTED"

Richard Kellogg Armstrong

14

1    to.

2                MR. HARMON:  Well, your Honor, I know

3    you've got a filled courtroom.  I think the best way

4    for me to proceed from the government's perspective is

5    to lay out our evidence through the case agent.  It

6    may take a little while.

7                THE COURT:  That's all right.

8                MR. HARMON:  I don't know if you want us

9    to do it now or have the other folks go.  I'm ready to

10   go.

11               THE COURT:  Go ahead.

12               MR. HARMON:  All right.  I call Special

13   Agent Greg Flynn.

14               THE COURT:  Before we get started on

15   this -- come on up.  I think I have some people here

16   for a civil case.  Are the parties here for the

17   three-thirty civil matter?  No?  I think we may need

18   to reschedule our hearing today, because I'm on

19   criminal duty and it's ten to four, and I have not

20   only this hearing, but two more after this that may

21   present evidence as well.  So could you buzz back to

22   my Chambers and get my -- my law clerk's name is

23   Jamie, and just buzz them and tell them that you're

24   here on that thirty-thirty matter and that you need to

25   reset this, and we'll reset it for a time that's

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.

15

1    convenient to your calendar.  This doesn't normally --

2    normally, we can set it at three-thirty, but you'll be

3    here until five-thirty, if I make you stay.

4                UNIDENTIFIED SPEAKER:  That's fine with

5    the defendants.

6                THE COURT:  I mean, if you want to wait,

7    I'll do it after we're through, but I bet we go until

8    five.

9        (Discussion off the record.)

10               THE COURT:  All right.  I'm sorry.

11   We'll proceed now in this matter.

12       (GREG L. FLYNN, GOVERNMENT'S WITNESS, SWORN.)

13               THE COURT:  Please have a seat.  State

14   your full name for the record and spell your last

15   name.

16               THE WITNESS:  Greg M. Flynn.  F-l-y-n-n.

17               MR. HARMON:  May I inquire, your Honor.

18               THE COURT:  Yes.

19                    DIRECT EXAMINATION

20   BY MR. HARMON:

21       Q    Good afternoon, sir.  Tell us how you

22   are employed.

23       A    I'm a Special Agent with the Internal

24   Revenue Service, Criminal Investigation Division in

25   Denver, Colorado.

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C.E.*

16

```
 1         Q      Is that commonly known as IRS CIV?

 2         A      It is.

 3         Q      How long have you been a Special Agent

 4    with IRS CIV?

 5         A      I've been employed with the IRS since

 6    July of '99, and I've been a Special Agent since

 7    January of 2000.

 8         Q      You see the defendant seated at counsel

 9    table?  Are you familiar with Richard Armstrong?

10         A      I am.

11         Q      How did you become familiar with him?

12         A      I was assigned an investigation into Mr.

13    Armstrong's submission of tax returns to the Internal

14    Revenue Service.

15         Q      And are you the case agent on that

16    investigation?

17         A      Yes, I am.

18         Q      And as a result of being the case agent,

19    have you fully familiarized yourself with the evidence

20    that was gathered in support of the -- in connection

21    with the investigation?

22         A      I have.

23         Q      And did you prepare an affidavit in

24    support of a Criminal Complaint charging this

25    defendant with crimes that are the subject of this
```

"ACCEPTED"

Richard Kellogg Armstrong

17

1    case?

2           A       I did.

3           Q       Does that affidavit summarize the

4    essential aspects of the evidence that was gathered in

5    the investigation as it stood at the time of the

6    filing of the Complaint?

7           A       It does.

8                   MR. HARMON:  Your Honor, I can show the

9    defendant -- the witness a copy of the Criminal

10   Complaint and affidavit, or I can ask the Court to

11   take judicial notice of it.

12                  THE COURT:  I can take judicial notice

13   of it.

14                  MR. HARMON:  Thank you.

15          Q       (By Mr. Harmon)  Can you provide the

16   Court with a brief overview of the factual basis for

17   the charges that were pending against -- let me

18   withdraw that.  The charges that were pending against

19   the defendant at the time you submitted an affidavit

20   in support of the Criminal Complaint, are they

21   essentially the same charges that are now pending in

22   the Indictment in this case?

23          A       They are.

24          Q       Okay.  Can you provide the Court --

25                  THE COURT:  Mr. Harmon, could you hold

"ACCEPTED"
Richard Kellogg Armstrong
December 10, 2013 C.E.

18

```
 1    up just a second.  I have to get court personnel for

 2    after five.  Go ahead.

 3                MR. HARMON:  I feel guilty, your Honor.

 4    I'm sorry about that.

 5                THE COURT:  That's all right.

 6         Q    (By Mr. Harmon)  Can you provide the

 7    Court with a brief factual overview of the basis for

 8    these charges that are pending?

 9         A    Yes.

10         Q    Go ahead, please.

11         A    The Internal Revenue Service received

12    three amended tax returns for the years 2005, 2006 and

13    2007 for Richard and Sharon Armstrong of Lake Havasu

14    City in Arizona.  These tax returns claimed the refunds

15    due to the Armstrongs of $1.4 million based on Federal

16    income tax payments withheld that were claimed on

17    Forms 1099-OID that were attached to the returns.  I

18    have investigated and contacted the institutions that

19    were listed as the purported issuer's of the forms

20    1099-OID, and they have informed me that they did not

21    generate those forms and they did not withhold the

22    federal income taxes claimed on those forms.

23         Q    And did you do other work in the

24    investigation, including, but not limited to checking

25    IRS records to see whether there was any factual basis
```

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.

19

1    for the supporting forms for those refund claims on

2    those returns?

3          A     I did, and I was unable to substantiate

4    the forms' legitimacy.

5          Q     And was the basis for these refund

6    claims essentially that income taxes that matched the

7    income reported in those 1099s was withheld by the

8    financial institutions purporting to have filed those

9    1099s?

10         A     That's correct.

11         Q     And was there any income tax withheld?

12         A     No.

13         Q     Okay.  And again, how much was claimed

14   in terms of the refunds for those three returns?

15         A     Roughly, $1.4 million.

16         Q     And what happened with the refund

17   claims?

18         A     The refunds, the Internal Revenue

19   Service issued three U.S. treasury checks for roughly

20   $1.6 million.

21         Q     What happened to those checks?

22         A     The checks were deposited into a bank

23   account at Bank of America for Richard and Sharon

24   Armstrong of Lake Havasu City, Arizona.

25         Q     And after that, were there any further

*"ACCEPTED"*

*Richard Kellogg Armstrong*

*December 10, 2013 C.E.*

20

1  returns that were filed that are the subject of the

2  charges against Mr. Armstrong?

3      A     There was one more return that was

4  filed.  A 2008 individual income tax return Form 1040

5  was filed with the IRS claiming a refund due of

6  roughly $1.7 million.

7      Q     And was that based on the same nature,

8  same basis for that refund claim?

9      A     They were very similar.  It was also

10  claimed -- there was a large amount of federal income

11  tax withheld claimed on the tax return itself that was

12  unsubstantiated.

13      Q     And did you determine that that claim

14  was actually false?

15      A     I did.

16      Q     And what happened with that refund

17  claim?

18      A     The refund was not issued for the '08

19  tax return.

20      Q     In all, how much was claimed by Mr.

21  Armstrong --

22      A     In excess of --

23      Q     -- for these tax refunds?

24      A     In excess of $3 million.

25      Q     In support of the case, did you develop

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.

21

```
 1    evidence as to who prepared the returns?

 2         A    I did.

 3         Q    And tell us about that, please.

 4         A    The returns were prepared by a

 5    gentleman, Curtis Morris, M-o-r-r-i-s, of Elizabeth,

 6    Colorado.

 7         Q    Did you do any investigation to

 8    determine who Mr. Morris dealt with in actually

 9    preparing these returns?

10         A    I asked Mr. Morris.

11         Q    What did he say?

12         A    He informed me that he dealt with Mr.

13    Armstrong.

14         Q    Now, did you get any evidence about what

15    happened between the time that these three checks

16    totaling, you said, in excess of 1.6 million was

17    cashed or deposited at Mr. Armstrong's bank account

18    and when the next tax return claiming another refund

19    was made?

20         A    Yes.  I have information on several

21    things that occurred during that time period.  There

22    were two things that were, I believe, noteworthy.  The

23    money was moved fairly quickly.

24         Q    What happened before the money was

25    moved?
```

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C.E.*

22

1    A    Before the money was moved, Mr.

2    Armstrong contacted his former Certified Public

3    Accountant in California, a gentleman named Ken

4    Chaffin (phonetic) by email and explained portions of

5    the OID program that he had participated in, as well

6    as the fact that he had received refunds from the IRS

7    of 1.6 million.

8    Q    This OID program, is that shorthand for

9    the -- what was done as a basis for making these

10    refund claims?

11    A    Excuse me.  Yes, it was.  OID is short

12    for Original Issue Discount.

13    Q    Is that the type of income that was

14    claimed and income tax withheld or allegedly withheld

15    for these forms?

16    A    On the '05, '06 and '07, yes.

17    Q    Okay.  And did you find out whether Mr.

18    Armstrong's established accountant had a response and

19    tendered an opinion to Mr. Armstrong concerning the

20    viability of this program and these refund claims?

21    A    Yes.  Mr. Chaffin responded in an email

22    to Mr. Armstrong shortly after receiving emails from

23    Mr. Armstrong detailing the program.  Mr. Chaffin

24    essentially read him the riot act, informed him that

25    the OID program he was participating in was not

"ACCEPTED"
*Richard Kellogg Armstrong*
DECEMBER 10, 2013 C.E.

23

1   legitimate and was, in fact, illegal.  Mr. Chaffin

2   strongly urged Mr. Armstrong to undue the claims and

3   return the money to the U.S. Treasury.  He also

4   informed him that the government would most likely

5   criminally prosecute individuals involved and could

6   possibly prosecute him as well.

7          Q     What happened then?

8          A     Mr. Armstrong had originally wanted Mr.

9   Chaffin to prepare his 2008 tax returns utilizing the

10  OID program.  Mr. Chaffin declined to do so, and then

11  Mr. Armstrong had his '08 tax return prepared by

12  Curtis Morris in Elizabeth, Colorado.  Also, Mr.

13  Armstrong, it appears, forwarded the email that he

14  received from Mr. Chaffin to a gentleman, Larry Hall,

15  H-a-l-l, stating, Larry, here's his reply, and then

16  that email was forwarded by Mr. Hall to Mr. Morris.

17         Q     My next question is what was happening

18  with the money that was embodied in these three refund

19  checks at the time Mr. Armstrong's established

20  accountant was advising him that this was a scam and

21  that he should undue these transactions?

22         A     Shortly thereafter, I believe within

23  either -- I'm not certain if it was 60 or 90 days, the

24  account at Bank of America that had received the $1.6

25  million, its balance was significantly lower.  I

"ACCEPTED"
Richard Kellogg Armstrong

24

1    believe it was under $10,000.

2        Q    What did you conclude from that?

3        A    We saw -- well, the money had been moved

4    fairly quickly.  We had seen --

5        Q    Before we get into the money, and I will

6    ask you about that in a moment.

7            When were the checks deposited in

8    relation to when this correspondence was had with Mr.

9    Armstrong's established accountant?

10       A    It was around the same time.  If memory

11   serves, it was December 15th and 16th where some of

12   the correspondence is, and I believe the checks were

13   deposited on December 15th into the account of Bank of

14   America.

15       Q    All right.  I'm going to ask you a

16   little bit later about your efforts to trace what

17   happened to the money once it made it to the bank

18   account of Richard and Sharon Armstrong, but for now I

19   want to get into something else.

20           As part of your work on the case, did

21   you investigate Mr. Armstrong's background?

22       A    I did.

23       Q    How did you go about doing that?

24       A    Well, I sought out available information

25   regarding his prior employment and general education

*" ACCEPTED "*
*Richard Kellogg Armstrong*
*December 10, 2013 C.E.*

25

1      and background.

2              Q      Through a records check?

3              A      Yes.  I performed a database search in a

4      database that the IRS has assess to.

5              Q      Did you obtain records from financial

6      institutions where it appeared he had accounts?

7              A      I did.

8              Q      Did you interview people who were

9      familiar with them?

10             A      A few, yes.

11             Q      Did you look at the tax return

12     information for returns that were filed over the years

13     by him and his spouse?

14             A      I did.

15             Q      Now, based on that, tell us a little bit

16     about it.  First tell us his age.

17             A      Mr. Armstrong is currently 76 years old.

18             Q      What did you find out about his work

19     history?

20             A      He's been retired for, I believe, 20

21     years.

22             Q      Is that what he said, or is that what

23     you concluded?

24             A      That's what I've heard from witnesses

25     and also from reviewing documents where he's indicated

*"ACCEPTED"*

*Richard Kellogg Armstrong*

*DECEMBER 10, 2013 C.E.*

```
 1    he was retired in various --

 2            Q     And based on what you've been able to

 3    conclude from the investigation, how does he occupy

 4    his time?

 5            A     As far as I can see, there are three

 6    locations where Mr. Armstrong spends his time.  I

 7    believe he has a residence in Prescott, Arizona, Lake

 8    Havasu, Arizona, and we also believe, although I have

 9    realized it's a point of contention, that he spends a

10    good amount of time in Cabo San Lucas, Mexico.

11            Q     Okay.  Tell us with respect to each of

12    those, how did you find out about the residence in

13    Prescott?

14            A     The residence in Prescott I first

15    learned of, it was the return address that Mr.

16    Armstrong used in correspondence with the Internal

17    Revenue Service.

18            Q     And did you do other investigations to

19    determine whether he lived at this address?

20            A     I did.  We did database searches, and

21    the public records indicate that the property is owned

22    by Mr. Armstrong and his wife.

23            Q     And did you do anything to determine

24    whether he actually lived at this address in Prescott?

25            A     We've tried to do that, and I do believe
```

"ACCEPTED"
*Richard Kellogg Armstrong*
DECEMBER 10, 2013  C. E.

```
 1      that it is one of the properties that he occupies.

 2             Q      All right.  Well, I'll ask you; did you

 3      travel to that address at some point?

 4             A      Yes, I did.

 5             Q      Okay.  And what was the purpose of

 6      traveling there?

 7             A      I was trying to arrest Mr. Armstrong.

 8             Q      Why did you go to that address?

 9             A      Because we believe that's where he was

10      at the time.

11             Q      Did you get specific information that he

12      would be at that address or in or about that location?

13             A      We had received information that Mr.

14      Armstrong's plane had landed at an airport in the

15      Phoenix area, and of the properties that he has,

16      Prescott was the closest to Phoenix, so we went to the

17      Prescott address hoping to effect his arrest.

18             Q      And who owns this particular residence,

19      did you determine that?

20             A      I believe it's currently titled in the

21      names Richard and Sharon Armstrong.

22             Q      And how long has it been that way?

23             A      I want to say December of '08; late

24      December '08, early '09.

25             Q      This other address in Lake Havasu, did
```

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C.E.*

1     you do an investigation into that?

2          A     Primarily, database searches and other

3     inquiries, yes.  There's a property, 585 Jones Drive,

4     in Lake Havasu.

5          Q     And did you determine that was connected

6     to the defendant?

7          A     Yes.

8          Q     How did you do that?

9          A     Well, public records indicated that at

10    one point he was the owner.  We'll also see things,

11    there were other indications that that was his home as

12    well.

13         Q     Okay.  And who owns that residence now?

14         A     Currently, the residence is titled in

15    the name Foreign Enterprises.

16         Q     Do you know anything about that entity?

17         A     It appears to be a design to obscure the

18    ownership of the property.  The address listed on the

19    quitclaim deed that was executed, the address listed

20    for Foreign Enterprises was an address in Carson City,

21    Nevada, and that particular address came back to a

22    mail drop that was rented by Mr. Armstrong.  And

23    basically, the company in Carson City, Nevada will

24    receive mail in Carson City, Nevada and simply forward

25    it to Mr. Armstrong's other post office box in Lake

*"ACCEPTED"*

*Richard Kellogg Armstrong*

*DECEMBER 10, 2013 C.E.*

29

1    Havasu.

2        Q    So I understand Foreign Enterprises is a

3  name.  Did you do any checking to determine whether it

4  was an entity that was incorporated anyplace?

5        A    The documents, the quitclaim deed

6  indicates that it's a Nevada unincorporated business

7  organization.

8        Q    Is there such a type of organization

9  recognized in Nevada?

10       A    Not that I'm aware of.

11       Q    I want to turn -- when was it

12  quitclaimed to this Foreign Enterprises at this Lake

13  Havasu address, residence?

14       A    It was after Mr. Armstrong received the

15  money.  I don't recall the exact date.

16       Q    This would be the 1.6 million in tax

17  refunds and interest?

18       A    Correct.  Excuse me.

19       THE COURT:  I'm sorry.  So I'm not

20  confused.  He deposited that money when?  What year?

21       THE WITNESS:  2008.  December 15th of

22  2008, your Honor.

23       THE COURT:  All right.  Thank you.

24       Q    (By Mr. Harmon)  And just to make sure

25  we've got the timeline right; is it your testimony

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C. E.

1    that in those two days, that day and the next day, he

2    had correspondence with his accountant who advised

3    him -- his established accountant, not Mr. Morris, who

4    advised him to return the money because this was a

5    scam?

6         A     Yes.  It's right around that time.  I

7    believe those are the dates.

8         Q     Now, let's talk about Cabo San Lucas.

9               Did you do an investigation to determine

10   whether the defendant had lived in the residence --

11   lived at a residence in Cabo San Lucas?

12        A     We had seen numerous indications that he

13   was a frequent visitor to Mexico, and we also saw

14   strong ties to Cabo San Lucas, so there was some

15   investigation, but it's difficult to obtain

16   information from --

17        Q     Well, let's ask.  What were the things

18   that gave you these indications?

19        A     Well, the first one that we had was --

20   is the plane that Mr. Armstrong operates for a period

21   of time was owned by a company called Cabo

22   Corporation.  We had also seen numerous porter

23   entries --

24        Q     So there are custom records that show

25   entry to -- entry into the United States from Mexico

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C.E.*

```
 1   and vice-versa?

 2        A    I believe that we have records showing

 3   entries into the United States.  I don't believe that

 4   we have information on the departures, but there were

 5   numerous entries to the United States.

 6        Q    Now, did you find anything, any records

 7   that indicated an ownership interest in real estate in

 8   Cabo San Lucas for Mr. Armstrong?

 9        A    Yes, I did.  I obtained a loan

10   application that Mr. Armstrong submitted to Cessna

11   Finance in late 2004, and on that loan application

12   Mr. Armstrong lists, in the description of real estate

13   owned, its res, r-e-s p-r-o-p, Cabo San Lucas,

14   Mexico.  He listed a date of purchase as 1989.  He

15   lists ownership percentage 100, cost or market value

16   280,000, mortgage amount is zero, mortgage equity

17   280,000.  The loan application also indicates that I

18   believe there are other parcels of land, and these are

19   listed as assets on a financial statement.

20        Q    And it's an application for what?

21        A    It was an application for a loan from

22   the Cessna Finance Corporation.  Cessna, I believe, is

23   the manufacturer of aircraft.

24        Q    Okay.  And who was taking out the loan?

25        A    Richard and Sharon Armstrong.
```

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C. E.*

1        Q      Was it the loan for the aircraft that

2    you believe Mr. Armstrong owns?

3        A      Yes.

4        Q      Do you have a copy of that, or is that

5    the only copy?

6        A      This is my only copy, but -- well, this

7    is the only copy I have with me, but I have more at my

8    desk.

9              MR. HARMON:  May I approach the

10   witness?  I'd like the Court and counsel to mark it as

11   an exhibit.

12             THE COURT:  Yes.

13        Q      (By Mr. Harmon)  I'm showing what we've

14   now marked as Grand Jury Government's Exhibit 1.

15             THE COURT:  Any objection?

16             MR. KORNFELD:  No objection, for

17   purposes of this hearing.

18             THE COURT:  Exhibit 1 is admitted.

19        (Government's Exhibit 1 was admitted.)

20             MR. HARMON:  How would you like me to

21   (unclear)?

22             THE COURT:  Do you want me to have it,

23   or do you want him to have it?

24             MR. HARMON:  I'd like you to look at it.

25             THE COURT:  All right.  Thank you.

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 G.E,*

1    Q    (By Mr. Harmon)  What work did you do to

2    determine whether Mr. Armstrong had this airplane?

3    Let me go back.

4              What type of airplane is this that you

5    believe Mr. Armstrong owns?

6    A    It's either a Beechum or a Beechcraft.

7    I'm not familiar with the planes, but it's a small

8    propeller driven aircraft, and it's an A-36, I

9    believe, is one of the designations, but I'm not an

10   airplane guy, so --

11   Q    Is it referenced in any court documents

12   in this case or related cases?

13   A    There's a related forfeiture proceeding

14   in which the aircraft is named.

15   Q    Okay.  And did you do any work -- what

16   work did you do to determine that Mr. Armstrong had an

17   ownership interest in the aircraft?

18   A    I performed database inquiries that

19   indicated that Mr. Armstrong owned aircraft and also

20   had a pilot's license, and then I contacted the

21   Federal Aviation Administration, and they furnished me

22   with records regarding Mr. Armstrong's pilot license,

23   his medical records pursuant to the application for

24   the pilot's license, as well as the ownership records

25   on several aircraft.

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E,

34

1      Q      Okay.  How many aircraft did it say he

2  owned?

3      A      At various times, there, I think, were

4  three different planes, but as I understand it, I

5  think he basically had one at any given time, but

6  there were a couple of planes that he had had prior to

7  this one.

8      Q      Did the records show that the airplane

9  that he most recently owned and owns today is the one

10  that's the subject of the forfeiture?

11      A      Yes.

12      Q      What about the pilot's license?  Tell us

13  about that.  What did you find from the records?

14      A      The records for the pilot's license

15  indicate that Mr. Armstrong has been licensed as a

16  pilot for some time.  I believe the records went back

17  to 1961.

18      Q      And so he's been licensed for well over

19  10 years, probably a lot longer; is that right?

20      A      Yes.

21      Q      What's he licensed to fly, if you know?

22      A      I don't know.  Or, excuse me.  He's

23  licensed to fly the -- I don't know.  Excuse me.

24      Q      Have you seen the airplane that he owns?

25      A      Yes.  It's a propeller driven aircraft.

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.

35

1     I believe it would seat four people, and it's --

2          Q     Is he licensed to fly that aircraft?

3          A     Yes, he is.  He flew that plane into

4     Calexico, California, on the day that he was arrested.

5          Q     All right.  So I asked you about the

6     airplane.  Can you tell us what investigation you did

7     into Mr. Armstrong's other assets and possessions.

8          A     Well, I reviewed the bank records that

9     the -- the bank records for his account at Bank of

10    America where the refund checks were deposited into,

11    and I noticed that there was -- there were some

12    transfers of funds overseas.  And then I performed

13    analysis of that account, as well as other bank

14    accounts, and I noticed that during 2007 and 2008, as

15    well as 2009, that Mr. Armstrong frequently received

16    wire transfers in from various entity names, and some

17    are from overseas as well.

18         Q     Can you describe the nature of the

19    transfers and the types of entities that were involved

20    in them.

21         A     I can.  I noticed frequent transfers

22    from an entity listed as Blackstone Pension, typically,

23    around $5000.  I noticed transfers into Mr.

24    Armstrong's accounts totaling over $100,000 from

25    Blackstone Pension.  A great many of those came from

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E,

36

1    accounts for Provident Bank & Trust of Belize.  I

2    noticed of the proceeds that $351,000 was wired to K

3    International Bank, also in Belize, and the wire

4    transfers indicated that the transfers were sort of

5    benefit of an entity Redwood Resources.  I noticed

6    that Mr. Armstrong also received a few wire transfers

7    from K International Bank, and one wire transfer in

8    November of 2008 actually indicated that a wire

9    transfer received from K International Bank also had

10   a notation that that included Redwood Resources.

11        Q    Okay.  And does that list the various

12   entities that you seem to have associated that

13   appeared to be foreign in character with Mr.

14   Armstrong?

15        A    There were a few more.  There was one

16   entity, Admiral Global.  I noticed that there was a

17   wire to Admiral Global of $24,500.

18        Q    When was that?

19        A    December 29th of '08.  And then I

20   noticed that there were two cashier's checks purchased

21   for $10,000 each made out to Admiral Global, and the

22   checks were endorsed by Richard Kellogg Armstrong, and

23   they bore stamps indicating that they were negotiated

24   at -- I believe they were negotiated in Mexico.

25        Q    I think you -- this last answer appears

"ACCEPTED"
*Richard Kellogg Armstrong*
DECEMBER 10, 2013 L. E.

1    to be you're talking now about tracing some of the

2    money that was sourced by the refund checks?

3         A    Yes.  I performed an analysis both of

4    the disposition of the refunds, as well as his

5    situation independent of that.

6         Q    I want to cover your efforts to trace

7    the refund proceeds a little later, but putting that

8    to one side; before that ever happened, those refund

9    checks happened, is it fair to say from your

10   investigation that you saw frequent financial

11   transactions with foreign entities or entities that

12   appeared to be foreign?

13        A    Yes.

14        Q    And these appeared to be located in

15   Belize, one place?

16        A    Yes.

17        Q    Where else?

18        A    It's a little -- the wire transfers do

19   indicate that there are transactions in Belize.  It's

20   unclear, though, because I think some of the banks

21   that are in Belize have accounts in other nations.

22        Q    Okay.

23        A    So but it definitely appeared that there

24   was money in accounts at banks in Belize.

25        Q    Is this money going from Mr. Armstrong's

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C.E.*

38

1    domestic accounts to these entities?

2         A     The refund checks we did see $351,000 --

3         Q     I'll talk about the refund checks in a

4    moment, but I'm just talking about --

5         A     Oh, no.

6         Q     -- but I'm just talking about before

7    this.

8         A     No.  Prior to the refund checks, no, we

9    saw money coming into Mr. Armstrong's accounts in the

10   United States.

11        Q     So these would be transfers from these

12   foreign entities into Mr. Armstrong's domestic

13   accounts?

14        A     That is correct.

15        Q     What type of -- what is the nature of

16   the transactions, the dollar amounts?

17        A     Basically, we saw $5,000 transfers from

18   Provident Bank & Trust of Belize to an account for

19   Bonanza Pacific Group in Lake Havasu, and they'd

20   pretty frequently get a $5,000 wire.

21        Q     So what is Bonanza Pacific Group?  Did

22   you do any investigations into that?

23        A     I did.  Bonanza Pacific Group was listed

24   by Mr. Armstrong as his employer, both on the loan

25   application submitted to Cessna Finance, as well as a

"ACCEPTED"
Richard Kellogg Armstrong
December 10, 2013 C.E.

39

1    mortgage application submitted to Countrywide Home

2    Loans.

3          Q      I thought that you said at the beginning

4    of your testimony that Mr. Armstrong claimed to be

5    retired?

6          A      The FAA documents did indicate that he

7    was retired.  On the loan applications submitted to

8    both Cessna and to Countrywide Home Loans, he listed

9    Global Pacific as an employer and listed on the

10   Countrywide Home Loan's application, Mr. Armstrong

11   listed his position as General Manager Investments and

12   indicated that he earned $15,000 a month base

13   employment income.  The loan application also

14   indicates that his wife, Sharon, is the secretary of

15   investments at Bonanza Pacific Group, and that she

16   earns $10,000 a month.

17         Q      So Mr. Armstrong's statement on this

18   loan application that he's the manager of Bonanza

19   Pacific, is it your testimony that that contradicts

20   what he told the FAA?

21         A      The FAA pilot documents indicated that

22   he was retired.

23         Q      And you don't know what he's told this

24   Court about what he does?

25         A      I don't.

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.

40

1    Q     Okay.  That would be in the Pretrial

2    Services Report, do you know?

3    A     I don't -- I haven't had a chance to

4    review that.

5    MR. HARMON:  I'd ask at this time that

6    the Court take judicial notice of the Pretrial Report

7    prepared in the Southern District of California, and I

8    believe that report says that the defendant purports

9    that he's been retired for 10 years.

10   Q     (By Mr. Harmon)  Now, did you ever find

11   out what Bonanza Pacific does and what Mr. Armstrong

12   purportedly does for Bonanza Pacific?

13   A     I never got a complete picture, but

14   Bonanza Pacific is a -- filed tax returns with the

15   Internal Revenue Service indicating that it was a

16   complex trust, and the address that it listed on its

17   tax returns, one of which was signed by Mr. Armstrong,

18   is in Canada.  Bonanza Pacific does maintain -- has a

19   bank account that listed an address in Lake Havasu,

20   Arizona.

21   Q     Anything else to add about the

22   investigation that you've done to date into Mr.

23   Armstrong's assets in his possession?

24   A     No.

25   Q     I will ask you in a moment about tracing

"ACCEPTED"
Richard Kellog Armstrong
DECEMBER 10, 2013 C.E.

1    those refund money, but before I do that I want to ask

2    about the status of the airplane that you determined

3    was owned by Mr. Armstrong.  Has it always been owned

4    by Mr. Armstrong in his name?

5         A    No.  Prior to December of 2008 it was

6    owned by Cabo Corporation, which is a company that is

7    owned by Mrs. Armstrong, according to the tax returns

8    that Cabo Corporation filed with the Internal Revenue

9    Service.

10        Q    Now, has that changed the ownership, the

11   title of that plane changed at all?

12        A    Yes, it has.  After receiving the $1.6

13   million from the U.S. Government, Mr. Armstrong issued

14   a check out of his personal account at Bank of America

15   for $345,000 to Cabo Corporation.  The memo on the

16   check was the tail number for the aircraft, and a

17   short while later a Bill of Sale was recorded with the

18   Federal Aviation Administration listing Richard and

19   Sharon Armstrong as the new owners of the aircraft.

20        Q    What happened to this airplane, do you

21   know?

22        A    It was seized by the United States

23   Government.

24        Q    Were you involved in the events that led

25   to the seizure?

"ACCEPTED"
Richard Kellogg Armstrong
December 10, 2013 C.E.

```
1           A      I was.

2           Q      I'll ask you about that in a moment.

3                  Are there anything missing, anything

4    missing from that airplane that is being sought in

5    connection with the forfeiture?

6           A      At this point, the Certificate of

7    Airworthiness was not present on the aircraft, and the

8    U.S. Government is still seeking the maintenance logs

9    for the aircraft.

10          Q      Have you done some work to determine

11   whether that Certificate of Airworthiness needs to be

12   in the airplane or not?

13                 MR. KORNFELD:  Your Honor, I'm going to

14   object.  This is irrelevant to the issues of

15   detention.  I mean, this is interesting in the

16   abstract to me, but I don't really know at this point

17   that it goes to this Court's determination of whether

18   there's a condition or combination of conditions that

19   will reasonably assure this defendant's ongoing

20   participation in this case.

21                 THE COURT:  What's the relevance?

22                 MR. HARMON:  I'll ask another question.

23   Maybe I'll make it clear.

24          Q      (By Mr. Harmon)  As part of the

25   forfeiture proceedings, is the United States
```

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.

43

1   Government seeking the Airworthiness Certificate of

2   this airplane?

3              MR. KORNFELD:  Same objection, your

4   Honor.  I mean, I don't even know why the forfeiture

5   of the plane is relevant.

6              MR. HARMON:  I'll make a proffer at this

7   time.

8              If one of the objects of the inquiry is

9   to determine whether the defendant can abide by court

10  orders, I think it's relevant to determine whether he

11  has abided by court orders in the forfeiture

12  proceeding.

13             MR. KORNFELD:  Well, your Honor, to that

14  point he's been in custody since this plane was

15  seized, so I don't see how he could not have abided by

16  any court orders.  He's been sitting in jail since May

17  the 21st, and the seizure was instigated after that

18  plane landed on U.S. soil on May the 21st.  So again,

19  I don't see how any of this is relevant to whether he

20  can abide by court orders.  If the allegation is he

21  abide by some FAA rule, I still don't think that's

22  relevant, but that seems to be where we're going.

23             THE COURT:  The objection is overruled.

24             MR. HARMON:  You know what?  I'll

25  address it in another way.

"ACCEPTED"
Richard Kellog Armstrong
DECEMBER 10, 2013 C.E,

44

1        Q        (By Mr. Harmon)  Let me ask you this,

2    Agent.  Tell us how it came to be that that airplane

3    was seized and where was it seized.

4        A        It was seized in Calexico, California by

5    the United States Customs and Border Protection

6    Agency.  Mr. and Mrs. Armstrong landed at Calexico and

7    went to clear U.S. Customs, and at that time Customs

8    and Border Protection effected the arrest of Mr.

9    Armstrong and also seized the aircraft pursuant to an

10   In Rem arrest warrant.

11       Q        Do you know how Customs was advised of

12   the arrest warrants for Mr. Armstrong and the arrest

13   warrant for the airplane?

14       A        I contacted them and informed them --

15   the FAA informed me that Mr. Armstrong was inbound to

16   Calexico, and we called Customs in Calexico and faxed

17   them down a copy of both the arrest warrant for Mr.

18   Armstrong, as well as the In Rem arrest warrant for

19   the aircraft.

20       Q        Do you know where he was coming from?

21       A        I don't, for certain.

22       Q        Okay.  Did you get any information on

23   where he was coming from?

24       A        We presumed it was Mexico, because

25   Calexico Airport and the Customs station is literally

*"ACCEPTED"*

*Richard Kellogg Armstrong*

*DECEMBER 10, 2013 C.E.*

45

1     on the fence with the United States.

2          Q     Where were you at the time you found

3     this out?

4          A     I was in Phoenix, Arizona.

5          Q     What were you doing there?

6          A     We had just attempted to serve the

7     arrest warrant and the seizure warrant on the plane in

8     Prescott, Arizona, but were unable to do so because

9     neither Mr. Armstrong nor the aircraft were in

10    Prescott, Arizona.

11         Q     Well, why did you go there, if he was

12    going to Calexico, California?

13               MR. KORNFELD:  Objection.  Relevance to

14    why the agent went here or there.

15               THE COURT:  Overruled.

16         Q     (By Mr. Harmon)  What are you doing in

17    Arizona when this plane's flying into Calexico?

18         A     We had information from Customs that Mr.

19    Armstrong's plane had landed at an airport in the

20    Phoenix area several days before, or a period of time

21    before we attempted to arrest -- effect the arrest.

22    And based on that information, as well as the fact

23    that he owned a property in Prescott, Arizona, we

24    figured we'd take a shot and start there.

25         Q     All right.  So you went to Arizona and

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E,

46

```
 1     you missed him there basically, is that it?

 2          A      Correct.  Correct.

 3          Q      Now, when the airplane was seized, was

 4     there any efforts made to obtain the flight log of the

 5     airplane?

 6          A      I don't believe so.

 7          Q      Was there any efforts made in the

 8     airworthiness of the aircraft?

 9          A      I don't believe so at that time.  The

10     next day I arrived at the Calexico airport with

11     another IRS special agent, as well as a contract pilot

12     who was scheduled to fly the plane out of Calexico to

13     a facility for storage, and after inspecting the

14     aircraft the pilot learned that the Certificate of

15     Airworthiness was not in the aircraft and that the

16     plane could not be flown without it.

17          Q      And should it have been in the aircraft?

18          A      I believe so, yes.

19          Q      And what effort was made to locate that

20     Airworthiness Certificate?

21          A      We asked the Customs officers that had

22     dealt with Mr. and Mrs. Armstrong if they had taken it

23     or if they had it, and they did not, and we searched

24     the aircraft and were unable to find it.

25          Q      Who was the last one out of the
```

"ACCEPTED"

*Richard Kellogg Armstrong*

DECEMBER 10, 2013 C.E.

1    aircraft?

2         A    Mrs. Armstrong.

3         Q    Have there been any efforts made to

4    formally request the Airworthiness Certificate?

5         A    I'm not certain on the Airworthiness

6    Certificate, but I know that special agents of the

7    Internal Revenue Service have asked Mrs. Armstrong to

8    provide the log, the maintenance logbooks which are

9    called for by the In Rem arrest warrant.

10        Q    When was that first requested?

11        A    Shortly after the arrest.  I believe the

12   arrest occurred on the 20th of May, and I think that

13   the conversation with her happened sometime in the

14   month of May.

15        Q    Do you have those air logs?

16        A    We do not.

17        Q    Why do you need those air logs?

18        A    They are very important to the ultimate

19   disposition of the seized asset and/or the U.S.

20   Government would need them to properly maintain the

21   aircraft while it's in our care.

22        Q    Now, prior to coming to the hearing to

23   testify today, have you done any investigation to

24   determine what somebody needs to fly this type of an

25   airplane domestically?  Do you need to file like --

*"ACCEPTED"*

*Richard Kellogg Armstrong*

*DECEMBER 10, 2013 C.E.*

48

1    A    Under certain situations, you do not.

2    Q    What situations are those?

3    A    I believe they're referred to as

4    visual -- unless you're flying under instruments or

5    internationally, I don't believe you're required to

6    file a flight plan.  So for example, if you were

7    flying simply from Phoenix to Denver and you did not

8    need to use your instruments, a flight plan is not

9    required, to the best of my knowledge, and that's

10   based on some conversations with FAA employees.  And

11   I'm also -- I'm not a plane guy, though, so --

12   Q    In connection with the work you've done

13   leading to this hearing, what have you learned about

14   the need or lack of need to file a flight plan to fly

15   from the United States to another country with this

16   type of (unclear)?

17   A    You would be required to file a flight

18   plan for the aircraft, if you're crossing a border.

19   Q    Do you need to clear Customs?

20   A    Not to leave.

21   Q    Now, is there anything, based upon your

22   research, that would preclude somebody from on a clear

23   day filing or not filing a flight plan and say that

24   they take an airplane, say they're going from Lake

25   Havasu, Arizona to Amarillo, Texas?

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.

49

1          MR. KORNFELD:  Objection.  Calls for

2     speculation.

3          THE COURT:  Well, can you rephrase it to

4     be like anywhere in the U.S.?  Is that what you're

5     getting at?

6          MR. HARMON:  I'm trying to find out

7     whether there's anything, based on this agent's

8     research, that would preclude somebody from planes be

9     taking a domestic trip without a flight plan and

10    taking that airplane across the boarder.

11         MR. KORNFELD:  I'll object on the basis

12    of foundation.  The agent has said at least two times,

13    and perhaps more, quote, unquote, I'm not a plane guy.

14    I'm not sure about maintenance.

15         MR. HARMON:  I'll ask him more questions

16    of foundation.

17    Q     (By Mr. Harmon)  Did you do some work to

18    find out precisely the answer to that question?

19    A     Yes, I did.

20    Q     What work did you do to find that

21    answer?

22    A     I asked the FAA.

23    Q     All right.  Did you talk to somebody at

24    the FAA about it?

25    A     I did.

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C.E.*

50

1        Q      Okay.  Based on what the people at the

2    FAA told you, tell us the answer to that.  Is there

3    anything that precludes somebody who is permitted not

4    to file a flight plan to take a domestic flight to

5    take that flight and to deviate and to cross the

6    border?

7        A      I don't believe there's anything that

8    would prevent them from doing so.

9        Q      All right.  Now I'd like to ask you

10   about what efforts you've made to trace the $1.6

11   million, which is in excess of $1.6 million, is that

12   right, the refund money?

13       A      A little over.

14       Q      What efforts have you gone through to

15   trace that money?

16       A      Analyzed bank records from Mr.

17   Armstrong's accounts.

18       Q      What did you find happened to that money

19   after it was deposited?

20       A      I saw that after the -- I have the exact

21   number here.  It's $1,637,481.61 was deposited into

22   his account at Bank of America on December 15th of

23   2008.  On January 29th of 2009, I noticed a wire

24   transfer, $150,000 to K International Bank, Ltd., K

25   International Bank for the benefit of Redwood

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.

1    Resources, and it contains an account number there,

2    10429.  Then out of the Bank of America account there

3    were three checks in 2009, two in January and one in

4    March for $265,000 from Mr. Armstrong's account to

5    Bank of America, to Mr. Armstrong's account at Compass

6    Bank, and then from Compass Bank there were two wires,

7    again to K International Bank, one wire for $150,000

8    on January 29th of 2009 and another wire for $36,000

9    on April 14th of 2009.  And then there was also a

10   $15,000 transfer from a personal account in Mr.

11   Armstrong's name at Chase Bank to K International

12   Bank.

13        Q      How much of this -- did you trace any of

14   this money to the purchase of real estate?

15        A      Yes, I did.

16        Q      Tell us about that.

17        A      We've identified two parcels of real

18   estate that have been purchased with the $1.6 million

19   proceeds in this scheme.  There was a property in

20   Brighton, Colorado, worth roughly $600,000.  Mr.

21   Armstrong wired $727,000 to a gentleman named Larry

22   Hall, H-a-l-l, and then Mr. Hall wired roughly

23   $600,000 to Land Title here in Denver and purchased

24   a piece of property in Brighton.  And then Mr. Hall

25   wired $127,000 back to Mr. Armstrong at Bank of

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.

52

1   America.  And then we also noticed that $150,000 was

2   paid to a Susan Miller to purchase her -- we believe

3   it was a 50% interest in the Prescott, Arizona

4   property.

5          Q      Now, the Brighton, Colorado property,

6   what was that originally titled in when it was

7   purchased?

8          A      It was originally titled in a trust's

9   name.  I don't recall the exact name, but Mr. Hall

10  was the one that dealt with Land Title, but Mr. Hall

11  requested that Land Title put the deed in the name of

12  a trust.  And then a short time later that property

13  was quitclaim deeded to Foreign Enterprises, which is

14  the same entity that received the 585 Jones Drive

15  property in Lake Havasu City from Mr. Armstrong.

16         Q      That's that so-called unincorporated --

17  isn't this the entity that has a mail drop as its

18  address?

19         A      Correct.

20         Q      Is that the one?

21         A      Correct.

22         Q      How much of this money have you not been

23  able to account for at this point, or trace?

24         A      About -- got about 600,000 that we

25  really don't have that firm a grasp on, aside from --

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 c.e.

53

1   we lost the trail when it went to Belize at this

2   point, so --

3          Q      How much money did you say went to

4   Belize?

5          A      I have $351,000 went to K International

6   Bank in Belize, and then we had about $44,000 go to an

7   entity, Admiral Global.  There was one transfer of

8   $24,500 to Germany, and then the two cashier's checks

9   for $10,000 each that were endorsed by Mr. Armstrong

10  and appeared to have been negotiated in Mexico.

11         Q      So about $600,000 you can't account for,

12  and roughly how much seems to have gone offshore from

13  that?

14         A      Of the 600,000 that we really don't have

15  pinned down, about, I'd say, 400,000.  So that 600,000

16  does include the 400 that we saw go offshore.

17         Q      Has the IRS made any efforts to recover

18  the refund proceeds that Mr. Armstrong deposited --

19  that were deposited into Mr. Armstrong and Sharon

20  Armstrong's account?

21         A      Yes.  The collection division of the

22  Internal Revenue Service contacted Mr. Armstrong in

23  July of 2009.  They placed liens on his known

24  properties and attempted to levy his accounts -- or

25  excuse me, they did levy his account at the Bank of

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.

54

1    America where the refunds were deposited.  Those

2    levies were successful in recovering only about

3    $10,000.

4           Q      Has Mr. Armstrong made, to your

5    knowledge, a response to these collection efforts?

6           A      Yes.  Mr. Armstrong called IRS revenue

7    officer Jerry Young, and Mr. Armstrong acknowledged to

8    Mr. Young that he had received the paperwork from the

9    IRS, and that Mr. Armstrong -- Mr. Armstrong told Mr.

10   Young that he had fixed it so the IRS liens would be

11   worthless.

12          Q      Now, at the beginning of your testimony,

13   I think you indicated that you had determined Mr.

14   Armstrong had residences in Lake Havasu, Arizona and

15   Prescott, Arizona; is that right?

16          A      Yes.

17          Q      And you heard the proffer of the defense

18   lawyer that the defendant would be amenable to

19   electronic home monitoring, is that right?  You heard

20   that?

21          A      I did hear that.

22          Q      Have you gotten a sense of where these

23   places are in locations of populated areas?

24          A      They're both in fairly remote areas,

25   certainly with respect to federal presence.  I believe

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C, E,

55

1    for Prescott the closest substantial federal presence

2    would be in Phoenix, which is about a two hour drive,

3    and then for Lake Havasu, I think it's, I think, at

4    least two hours from Phoenix as well, and it's fairly

5    remote.  Both locations are somewhat remote.

6            Q     I'm just about done.  I have one more

7    (unclear)?

8                  MR. HARMON:  May I approach the

9    witness?

10                 THE COURT:  Yes.

11           Q     (By Mr. Harmon)  I'm going to show you

12   what we've marked as Government's Exhibit 2.  Do you

13   recognize this document?

14           A     I do.

15           Q     And how did you come to recognize it?

16           A     We served a subpoena on godaddy.com for

17   any business transactions that they had had with

18   Mr. and Mrs. Armstrong.  And godaddy.com provided us

19   with billing records that had a list of a handful of

20   websites that Mrs. Armstrong was renting -- or Mr.

21   Armstrong -- Mrs. Armstrong, excuse me, was paying

22   Godaddy to use that space.  And of them, one of them

23   was a caborealtors.com, and when I entered

24   caborealtors.com, this was what came up on my screen.

25           Q     So those two pages there that I've

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C.E.*

```
1    marked as Government's Exhibit 2, what is it

2    (unclear)?

3                THE COURT:  Mr. Kornfeld, I can hear

4    when your client talks too close to the microphone.

5                MR. KORNFELD:  Oh.  Sorry, your Honor.

6    My client's hearing impaired, so I will try to get him

7    to turn it down.

8                THE COURT:  Yes.  Push the bottom or

9    something.

10               MR. KORNFELD:  Yeah.  Thanks.

11        Q     (By Mr. Harmon)  The two-page document

12   in front of you, what is that?  How does it relate to

13   the testimony of Sharon Armstrong?

14        A     It's a printout for Cabo Realtors, and

15   on it Sharon Armstrong describes her realty business

16   in Cabo San Lucas.  The two pages are two pages that I

17   printed out on the computer at IRS.

18        Q     This is for one of the websites you

19   found associated with Sharon Armstrong?

20        A     That's correct.

21        Q     And what's depicted in these two pages?

22        A     Basically, it's a website for

23   Mrs. Armstrong's realty company, and there's a picture

24   of Mr. and Mrs. Armstrong in front of a big blue fish.

25        Q     Where does it say it's located?
```

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C.E.,*

```
 1        A      Says she's -- it says, "Direct to
 2   Cabo."  So it -- it indicates that she has a local
 3   phone number for Cabo.
 4        Q      And does it indicate in the web pages
 5   there, or the ones you've seen, how long she's had a
 6   presence in this area?
 7        A      I'm not sure.  This particular document
 8   does not.
 9        Q      And from what you've reviewed from the
10   website, does it's appear to be a recently founded
11   business or a long established business?
12        A      I couldn't say.  I'm sorry.
13              MR. HARMON:  All right.  I'd move to
14   admit Government's 2 at this time.
15              MR. KORNFELD:  No objection, for
16   purposes of this hearing.
17              THE COURT:  Exhibit 2 will be admitted.
18        (Government's Exhibit 2 was admitted.)
19              MR. HARMON:  Can I just (unclear) a
20   copy?
21              THE COURT:  Sure.
22              MR. HARMON:  That concludes the
23   questions I have.  I'd tender the documents to the
24   Court.
25              THE COURT:  All right.  Mr. Kornfeld.
```

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C,E,*

58

1                    MR. KORNFELD:  Thank you, your Honor.

2                         CROSS-EXAMINATION

3    BY MR. KORNFELD:

4         Q    Agent, we've heard a lot of information.

5    I want to try to confine my questions, as best I can,

6    to the issues I believe are before the Court.  And

7    maybe I'll work backwards.

8              You were just asked a series of

9    questions about Mrs. Armstrong, and you were shown

10   Government's Exhibit 2, and you talked briefly about

11   her real estate business in Cabo.  Do you generally

12   recall that testimony?

13        A    Yes, sir.

14        Q    Mrs. Armstrong is not an indicted

15   defendant in this or any related case, is she?

16        A    Not indicted, no.

17        Q    Well, and she's not charged in the

18   Criminal Complaint, is she?

19        A    Not at this time.

20        Q    Oh, okay.  So as we stand here today,

21   she is not a defendant in any -- in this case or in

22   any related case, correct?

23        A    That is correct.

24        Q    And it is not illegal for -- and by the

25   way, to your knowledge she has no prior criminal

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C. E.

59

```
 1       history either, does she?

 2             A     Not that I'm aware of.

 3             Q     Okay.  It's not illegal for an American

 4       citizen to have a erstwhile business in Cabo San

 5       Lucas, is it?

 6             A     Not to my knowledge.

 7             Q     Other than this Godaddy website,

 8       Government Exhibit 2, do you have any knowledge as to

 9       the volume of business, if any, that Mrs. Armstrong

10       conducted in Mexico?

11             A     I do not.

12             Q     Do you have any knowledge as to the

13       participation, if any, other than appearing in a photo

14       in front of a big blue fish that Mr. Armstrong had in

15       connection with this real estate business in Cabo?

16             A     No.

17             Q     Do you have any knowledge that it is

18       illegal for Mr. Armstrong to send out the associated

19       with this business if, in fact, he was associated with

20       this business?

21             A     No.  We weren't -- no.

22             Q     Okay.  And you talked a lot about this

23       defendant's travel back and forth to Mexico.  It's not

24       illegal for a U.S. citizen to travel to Mexico, is it?

25             A     Not to my knowledge.
```

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 18, 2013 C.E.*

```
 1          Q      Not illegal -- or excuse me.  Not

 2   unusual for retired folks who live in Arizona to

 3   travel to Mexico, is it?

 4          A      I wouldn't know.

 5          Q      Well, I mean, you've speculated about a

 6   bunch of things, so I'm going to ask you to indulge me

 7   a little bit.

 8          A      It wouldn't seem unreasonable to me at

 9   all.

10          Q      Okay.  I mean, retired people oftentimes,

11   if you want to be general about it, like to go where

12   it's warm, right?

13          A      I guess.

14          Q      Cabo is warm, is it not?

15          A      I believe so.

16          Q      Cabo is a resort community, is it not?

17          A      I believe so.

18          Q      Lake Havasu is a resort community, is it

19   not?

20          A      I wouldn't know.

21          Q      Okay.  Well, you spent time in the

22   Phoenix area, right?

23          A      A little bit.

24          Q      You would agree with me that the Phoenix

25   area is replete with retired folks down there to enjoy
```

*"ACCEPTED"*

*Richard Kellogg Armstrong*

*DECEMBER 10, 2013 C.E.*

61

1    the good weather, correct?

2           A    I saw a few.

3           Q    Okay.  There's nothing nefarious about

4    Mr. Armstrong residing in the state of Arizona, is

5    there?

6           A    No.

7           Q    There's nothing illegal about him

8    residing in Arizona, is there?

9           A    No.

10          Q    There's nothing illegal about having

11   several residences, is there?

12          A    In this instance there may be, because

13   one of the residences appears to have been purchased

14   with the proceeds of a specified unlawful activity.

15          Q    Well, and due process will take care of

16   that both in the civil and in the criminal world; but

17   what I'm asking you is, it's not illegal for someone

18   to maintain more than one residence, as a general

19   rule?

20          A    It would depend.

21          Q    In this case, do you have any knowledge,

22   other than what you've talked about, that there was

23   anything illegal of Mr. Armstrong maintaining two

24   residences?

25          A    Other than the fact that one of them was

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C, IE,*

62

```
1    purchased with the proceeds of a specified unlawful

2    activity, no.

3            Q       And that's your allegation, but that

4    allegation is yet to be proved beyond a reasonable

5    doubt, correct?

6            A       I understand, but you asked me if it was

7    legal or illegal, and in my opinion it's illegal.

8            Q       Well, I understand that.  And there's

9    nothing illegal, is there -- by the way, you have no

10   evidence that Mr. Armstrong prior to the date of his

11   arrest was aware that he was under federal criminal

12   investigation, do you?

13           A       Mr. Armstrong may have been alerted to

14   the fact that there was an investigation, because the

15   IRS executed a search warrant at his return at his

16   home on July 1st of '09, but we did not -- generally

17   speaking, no, but he may have been.

18           Q       Well, and I'm not asking you what may

19   have.  I asked you a specific question.

20                   Do you have any knowledge, specific

21   knowledge, if he was aware of the fact that indeed a

22   search warrant was executed at the home of the

23   codefendant approximately a year before his arrest?

24           A       I don't have specific information that

25   Mr. Armstrong was informed, but Mr. Morris did send
```

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.R.

63

1    out a general email to his clients alerting them to

2    the fact that he had been raided.

3         Q    And you know that because during the

4    execution of the search warrant of Mr. Morris, you

5    recovered his computers and you looked at his email,

6    right?

7         A    No.  I learned that subsequently from

8    witnesses.  Because the day of the warrant Mr. Morris

9    sent out the email and request that I'm talking about

10   alerting his clients after the warrant, so we did not

11   learn of that through the image of the search warrant

12   because that was taken prior to that email

13   communication.

14        Q    Okay, but I'll ask the question again.

15             Do you have any direct knowledge that

16   this man, this defendant, Mr. Armstrong, was aware of

17   the fact that a search warrant had been executed by

18   federal law enforcement at the home of his tax -- or

19   excuse me -- at the offices or home of his tax refund?

20        A    I don't know.

21        Q    And if he did, you would agree with

22   me -- well, whether he did or whether he didn't, the

23   fact remains that Mr. Armstrong flew back and forth,

24   according to your testimony, and traveled back and

25   forth between Mexico and the United States, correct?

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C.E.*
64

```
 1          A      Correct.

 2          Q      So if, as you speculate you might have

 3    known, the fact remains that he was literally flying

 4    back to his home jurisdiction, the United States,

 5    correct?

 6          A      Correct.

 7          Q      And people flying back to places where

 8    they get arrested is inconsistent, you would agree

 9    with me, with attempts to evade arrest, is it not?

10          A      If they're aware of it, yes.

11          Q      Right.  If they're aware of it.  And you

12    have no specific direct evidence that this man was

13    doing anything to attempt to flee the jurisdiction of

14    the United States in connection with this

15    investigation, do you?

16          A      No.

17          Q      And in fact, his actions belie that.

18    They're completely opposite of someone who would

19    attempt to flee.

20          A      Actually, I don't believe that Mr.

21    Armstrong was aware of the fact that he was under

22    investigation.  I went through great effort to conceal

23    that so that we could effect the arrest.  I was

24    fearful that if we had tipped our hand and notified

25    Mr. Armstrong that he was under investigation, that he
```

Case 1:10-cr-00317-REB   Document 48   Filed 07/17/10   USDC Colorado   Page 65 of 101

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C.E.*

65

1    may have fled the jurisdiction.  So I don't believe it

2    is consistent because -- I do believe that he was not

3    aware that he was under investigation.

4            Q       Putting aside this investigation, you

5    have no -- there's no history of any criminal

6    background in this 76 year old man's past, is there?

7            A       Not that I'm aware of.

8            Q       And therefore, there's no history of

9    failure to appear, or anything like that, correct?

10           A       Not that I'm aware of.

11           Q       Okay.  You were asked a bunch of

12   questions about FAA rules and regulations.  It's true,

13   is it not, that you do not purport to be an expert on

14   FAA rules and regulations, right?

15           A       That is correct.

16           Q       You don't hold a pilot's license, do

17   you?

18           A       No, sir.

19           Q       You've not worked for the FAA, have you?

20           A       No.

21           Q       And other than asking some FAA folks

22   some questions, that is the sole basis of your

23   knowledge, correct?

24           A       Generally speaking, FAA folks and then

25   other people familiar.

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C.E.*

66

1        Q      Okay.  You're not telling this Court

2   that it is somehow a crime not to have a logbook in an

3   airplane, are you?

4        A      No.

5        Q      Okay.  You're not telling this Court

6   that it is somehow a crime not to fly with an

7   Airworthiness Certificate, are you?

8        A      Actually, I believe it is.

9        Q      A federal criminal offense?

10       A      Let's put it this -- the look on the

11  faces of the pilots, they said that plane cannot move

12  an inch without it, and I don't know if it was a crime

13  or not, but it was certainly -- it was as serious as a

14  heart attack for these guys.

15       Q      Well, I'm not asking about the pilots,

16  and I'm not asking about the looks on their faces.

17  I'm asking you; you have no knowledge that in this

18  very thick federal criminal code and all the codes of

19  federal regulations, you are not aware, are you, that

20  it is a crime to fly without the certificate?

21       A      I wouldn't be an expert on that, no.

22       Q      Okay.  And he's not charged with flying

23  without valid insurance or something, is he?

24       A      No.

25       Q      Now, you testified -- back to the whole

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C. E.

67

1    plane thing, you said -- you essentially testified

2    that there's nothing to prevent this man because he

3    is a licensed pilot from hopping in an airplane and

4    flying domestically as long as he wasn't filing a

5    flight plan, correct?

6           A     That's my understanding.

7           Q     And your understanding is that if

8    essentially you're eye-balling, you're flying on your

9    vision, not on your instruments and it's domestic, you

10   don't have to have a flight plan.

11          A     That's my understanding.

12          Q     And are you testifying under oath that

13   that is, in fact, the FAA regulation?

14          A     I couldn't say -- I believe it is.

15          Q     Okay.  Now, you testified that the

16   government seized this airplane, right?

17          A     Correct.

18          Q     So this airplane, even if this gentleman

19   is out, this airplane is unavailable to him to use to

20   fly, right?

21          A     Correct.

22          Q     And you have no knowledge that he would,

23   short of stealing an airplane, you have no knowledge

24   that he has any access to any other airplane that he

25   could fly, whether it be on instruments or not on

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.

68

1    instruments, do you?

2         A     Actually, we believe that he could quite

3    possibly have access to any aircraft, then he would

4    certainly have the ability to operate one.

5         Q     No, that wasn't my question.  My

6    question is, short of stealing, you identified to

7    Judge Tafoya a specific airplane that he has access

8    to that he could use to flee this jurisdiction.

9         A     Well, he could rent one.

10        Q     Well, let's talk about that.  Now,

11   you've rented a car, haven't you?

12        A     Yes.

13        Q     And you have to show that you're insured

14   and that you have a driver's license, correct?

15        A     Yes.

16        Q     You're not testifying, are you, that you

17   can show up without your pilot's license and just tell

18   someone, I've been flying since 1961.  Can I have an

19   airplane, please?

20        A     Well, but when we rent cars, if one

21   person presents their license, that wouldn't prohibit

22   other people from operating the vehicle.

23        Q     I'm not asking you to speculate.  Who

24   else can fly here?  Who else are we talking about?

25        A     I would imagine, having been a pilot

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.

69

1    since 1961, he may have a friend or two in the pilot

2    community.

3           Q      Okay, but I'm not looking for

4    coconspirators to help him fly to leave the

5    jurisdiction.  I'm asking you, do you have knowledge,

6    not speculation, not supposition.  Do you have

7    knowledge, as you sit here under oath, that short of

8    presenting a pilot's license this man would be able to

9    rent an airplane?  Do you know that to be possible as

10   a fact?

11          A      I don't know.  I don't know that the

12   lack of a license would prohibit him from doing so.  I

13   don't know either way.

14          Q      But you would agree with me that the

15   lack of a valid driver's license would prohibit him

16   from renting a car at Hertz in Prescott, Arizona?

17          A      I don't know that.

18          Q      Well, you've rented cars.  You just told

19   me that, right?

20          A      I have.

21          Q      So we're not really quibbling about you

22   have to be a licensed driver to rent a rental car, are

23   we?

24          A      I understand, and I see where you're

25   going, but I can't tell you what Hertz Rent-A-Car

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.

70

1    would or would not do.

2         Q    But you also can't tell me whether there

3    are rent-a-plane Hertz or equivalents, that they're

4    going to rent a plane to someone who doesn't have a

5    license in their pocket, right?

6         A    I don't know.

7         Q    Okay.  Now, you said that there would be

8    nothing to prevent him from fleeing the jurisdiction.

9    Are you aware of the fact that the border patrol and

10   the U.S. Air Force, post 9/11, that there are various

11   military and civilian law enforcement entities that

12   routinely patrol United States air space?

13        A    I'm aware of that.

14        Q    Okay.  So is it still your testimony

15   under oath that there is nothing that would prevent or

16   anybody in the U.S. from renting a plane, flying it

17   across our borders without filing a flight plan?  Is

18   that your testimony?

19        A    I'm not aware of what would prohibit

20   them from doing so.  So I don't know.

21        Q    So you don't know what the criteria is

22   or isn't for the Air Force scrambling jet fighters

23   when people penetrate air space, do you?

24        A    I'm not aware of any instance of the

25   United States Air Force scrambling a plane to prevent

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C.E.*

```
 1    someone from leaving.

 2         Q     So your statement before that there

 3    appears to be nothing to prevent anyone from hopping

 4    in a plane and leaving U.S. air space without filing a

 5    flight plan is just your supposition.  It's not based

 6    on fact or foundational knowledge that you have, is

 7    it?

 8         A     That's -- yes.

 9         Q     Okay.

10         A     And by the way, the IRS did have a

11    gentleman fly a plane into one of our buildings, so

12    you know, people don't always do what they're supposed

13    to do with their aircraft, sir.

14         Q     And you're aware of the fact that the

15    military scrambled planes when that plane was in the

16    air, are you not?

17         A     I'm not.

18         Q     Okay.  Well, then, let's not -- I'd ask

19    you to answer my questions and please not to --

20         A     Understood.

21         Q     -- assume.  You talked a lot about these

22    few homes.  If my understanding is correct, Prescott

23    and Lake Havasu are both subject to IRS liens,

24    correct?

25         A     That is correct.
```

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C.E.*

72

1       Q       Many homes -- the Prescott home was

2   titled in Mr. Armstrong's own name, correct?

3       A       Yes, along with his wife.

4       Q       Okay.  Nothing nefarious about titling a

5   primary resident in your own name, is there?

6       A       Not that I'm aware of.

7       Q       Okay.  You testified that at some point

8   Lake Havasu was titled in some legal entity or a

9   supposed legal entity, correct?

10      A       I'm not aware of any legal entity

11  referred to as a Nevada unincorporated business

12  organization, but it's an entity.  I don't know if

13  it's legal or not.

14      Q       Well, the state of Nevada allowed the

15  quitclaim, didn't it?

16      A       No.

17      Q       So there's no title?

18      A       The quitclaim occurred in Arizona, sir.

19      Q       Excuse me.  The state of Arizona allowed

20  the quitclaim, did it not?

21      A       I don't believe that when you file

22  something of that sort, that anybody really opines on

23  it.  They just simply take the document.

24      Q       And you're not testifying -- I mean,

25  you're saying that basically your research indicated

"ACCEPTED"
Robert Kellogg Armstrong
DECEMBER 10, 2013 C.E.

73

1     you don't think this entity was a valid entity, but

2     you didn't spend a lot of your time trying to

3     determine what this supposed entity was or wasn't, did

4     you?

5          A     Well, there was no employer

6     identification number with the Internal Revenue

7     Service.  There were no records for that address with

8     the Nevada Secretary of State, and the address came

9     back to a Value Corp. Services, which is a mail

10    forwarding business.  And we subpoenaed Value Corp.

11    Services, and Value Corp. provided their documents

12    indicating that the address that was listed for

13    Foreign Enterprises is an address that Mr. Armstrong

14    receives mail at, and that mail is simply forwarded to

15    him at another P.O. box in Arizona.

16         Q     So easily traceable to this man?

17         A     No, no.

18         Q     Not easily traceable?

19         A     No.  Not without a Grand Jury subpoena.

20         Q     Okay.  Now, are you aware of the fact

21    that oftentimes people register residences not in

22    their own name, but in trusts or other legal entities?

23         A     I've heard of the practice, yes.

24         Q     Okay.  And are you aware there's nothing

25    illegal about using a drop box?  Those are legal

*"ACCEPTED"*

*Richard W. Kellogg Armstrong*

*DECEMBER 10, 2013 C.E.*

74

```
1     businesses in the United States, aren't they?

2          A     It appeared to me to be an act to

3     conceal --

4          Q     I'm going to interrupt you, excuse me,

5     and I'm going to ask -- with all due respect, I'm not

6     interested in your opinions.  I'm asking you fact

7     based questions.

8                Is it illegal, based on your experience

9     as a special agent, a law enforcement officer, to use

10    drop boxes or mail services, or whatever you want to

11    call them, is that an illegal act in the United

12    States?

13         A     It depends on how you use them.

14         Q     Is the use of them prevented or

15    precluded by the United States Code, to your

16    knowledge?

17         A     No.

18         Q     Is it precluded by Title 26 of the

19    United States Code, to your knowledge?

20         A     No.

21         Q     If I owned a mail box company, am I

22    committing a federal or state offense, to your

23    knowledge?

24         A     No.

25         Q     You were asked a bunch of questions
```

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C.E.*

75

1    about Mr. Armstrong's correspondence with his CPA in

2    California on or about December 16th, 2008.  Do you

3    recall that testimony?

4              A    I do.

5              Q    And you indicated that this CPA rendered

6    an opinion basically that said, Dick, don't do it,

7    right?

8              A    Yes.

9              Q    And then he subsequently went to another

10   tax preparer, Mr. Morris, correct?

11             A    He had actually previously gone to Mr.

12   Morris as well.

13             Q    Okay.  In your experience as an IRS

14   agent, it is not uncommon, is it, for people sometimes

15   to ignore the advice of lawyers or accountants or tax

16   preparers?

17             A    Pretty much everybody I arrest.

18             Q    Pretty much what?

19             A    Pretty much everyone I arrest, sir.

20   Yes, it happens.

21             Q    Okay, but that's not my question.  My

22   question is, is it illegal to seek a second opinion or

23   to otherwise ignore good advice?

24             A    No.

25             Q    It may not be smart, but is it illegal,

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 CJE.

```
 1    is my question?

 2           A     It would depend on the circumstances.

 3           Q     Okay.  But here you essentially indicate

 4    that he was told not to do it, but in fact he was told

 5    not to do it the day after the money was transferred;

 6    is that correct?

 7           A     He was actually told undue it and to

 8    give the money back, and Mr. Chaffin provided a link

 9    to the Internal Revenue Service website that detailed

10    that there's basically a fraud alert on this type of

11    activity.  And of the four claims that were submitted

12    to the IRS, one of them, the 2008 tax return, occurred

13    after the email.  The other three occurred prior.

14           Q     Okay.  Now, you indicate in your

15    Complaint, which is in the record, that in this email

16    correspondence that you refer to in your testimony,

17    that Mr. Armstrong essentially outlined his belief

18    about the validity of this OID process, even though

19    the accountant disagreed with that, right?

20           A     Yes.  Basically, the emails were -- Mr.

21    Armstrong sent Mr. Chaffin an email explaining what

22    had occurred and that he had received a large refund.

23    Mr. Armstrong also sent under a separate email a

24    lengthy document explaining the validity of the OID

25    program that had numerous reasons, I believe,
```

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.

77

1      purporting why this program was legitimate.

2             Q       Yeah, and these reasons go back to 1933

3      and various house bills and things like that, correct?

4             A       Yes.  It says things along the lines of,

5      you know, we're not U.S. citizens, we're -- that, you

6      know, as long as you don't take benefits from the

7      system you're entitled to do this, and things of that

8      nature.

9             Q       And you're not testifying today as to

10     the strength or lack thereof or the sincerity or lack

11     thereof of those beliefs by Mr. Armstrong as he

12     articulated them in the emails you quote in your

13     Complaint, are you?  In other words, you don't know

14     what he believed or didn't believe.

15            A       I've noticed some inconsistencies

16     between Mr. Armstrong's actions and the views that

17     were put forth in the OID document.  For example, Mr.

18     Armstrong --

19            Q       I'm going to interrupt, again.  That's

20     not my question.  My question is --

21            A       I don't understand.

22            MR. HARMON:  David, I'd have to object

23     at this point.  I think he's trying to answer the

24     question, which is basically what does he believe Mr.

25     Armstrong believes, and the agent's about to explain

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013  C.E.*

78

1    why because of an inconsistency between actions and

2    statements he believes one thing as opposed to

3    another.  I'd ask him to be allowed to answer the

4    question.

5              THE COURT:  I think it's fair to let him

6    answer.

7              MR. KORNFELD:  Okay.  Fair enough.

8         A    The document indicates that --

9         Q    (By Mr. Kornfeld)  Email?

10        A    Yes.  The email.  There was an email,

11   and then there was an attached document.  I believe it

12   was titled the relatively brief history of OID and why

13   it must be returned to the source, you, and that

14   document explains that the people that participate in

15   this program are not citizens of the United States.

16             Now, Mr. Armstrong does have a U.S.

17   passport and indicates his dealings with the FAA that

18   he is a citizen of the U.S.  And it appears to me that

19   the only person, the only organization that I can see

20   where he asserts that he's not a U.S. citizen is when

21   he's dealing with the Internal Revenue Service.

22        Q    And many people make numerous assertions

23   to the IRS as to essentially the government's

24   jurisdiction over us as, quote, unquote, citizens,

25   don't they?  I mean, you can go on the IRS website, as

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.

79

```
1    I did today, and there's a whole menu of different --
2    I don't remember what they call it, false assertions
3    where the IRS goes through and says --
4           A      Some folks do it.  I don't believe
5    they're widely held views, but there are a good deal
6    of people who engage in this sort of conduct.
7           Q      Okay.  And there is a, quote, unquote,
8    tax protestor movement.  That's sort of one branch of
9    people that engage in this conduct, right?
10          A      I don't believe I'm allowed to use those
11   words.
12          Q      Okay.  Well, I am.
13          A      I believe you might be correct in doing
14   so.
15          Q      Okay.  But the point is, I mean, there's
16   not surprising in a country of 325 million people,
17   there is a wide range of views about the government,
18   the IRS, the abilities to tax, et cetera, correct?
19          A      I don't know.
20          Q      If you know.
21          A      I don't know.
22          Q      Okay.  But my point, going back to the
23   earlier point before you explained what you believe to
24   be the inconsistencies, my point is, whatever Mr.
25   Armstrong's beliefs are, you don't know how sincerely
```

*"ACCEPTED"*
*Richard Kelly Armstrong*
*DECEMBER 10, 2013 C.E.*

1    or not he holds those beliefs.  All you know is what

2    he wrote and what he did or didn't do, right?

3          A    Once again, though, that would be a

4    fairly clear indication of how sincere you are in your

5    beliefs.  If you do not walk the walk and you're just

6    talking the talk, then I would say that you don't

7    really hold them and you don't really believe them.

8          Q    So it's your testimony that the fact

9    that he obtained a U.S. passport indicates that all

10   what he put in this email he doesn't believe?

11         A    I don't know.  It's one of the

12   indicators that this belief is not -- it's certainly

13   an inconsistency that I would point to people that say

14   if you truly believe this program, then you shouldn't

15   have a U.S. passport.  If you truly believe this

16   program, you shouldn't take your Social Security check

17   every month, because that's also forbidden in the

18   document that was provided to Mr. Chaffin.  And the

19   other thing is that the document explains that

20   essentially that it thinks that U.S. currency is

21   worthless paper.  And as Mr. Chaffin pointed out to

22   Mr. Armstrong in his email, if you truly believe that

23   U.S. currency is worthless paper, what do you need a

24   million six dollars for?  And the other inconsistency

25   that I've noted is that Mr. Armstrong seems to use

"*ACCEPTED*"
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C.E.*

81

```
 1    U.S. currency to purchase goods and services and go

 2    about his life.  If you truly thought U.S. currency

 3    was worthless and there was a million dollars of U.S.

 4    currency and you truly believed it to be worthless,

 5    why wouldn't you simply walk right by it?

 6           Q     Well, and there are the barter people,

 7    right, that try not to have income, not pay taxes

 8    because as they barter, they don't earn income.

 9    That's a group of folks you've probably dealt with in

10    your years of the IRS, correct?

11           A     I have not.

12           Q     Okay.  You're lucky, then.

13           A     Well, people who are bartering probably

14    aren't making enough to show up on the radar.

15           Q     Let me ask you some more pointed

16    questions about some of the issues on the conditions

17    or combinations.

18                 You don't know -- you testified that

19    Prescott and Lake Havasu are approximately two hours

20    from Phoenix, but you don't know the capabilities or

21    lack thereof of the electronic home monitoring

22    equipment, do you?

23           A     I'm a little familiar with it, and I'm

24    concerned that he'd be able to pop the bracelet and

25    get on a plane and scoot.
```

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*DECEMBER 10, 2013 C.E.*

82

1    Q    Well, I understand that.  But with due

2    respect, that's the Court's concern.  What I'm asking

3    you is, you don't know where every probation officer

4    or pretrial service officer in the Phoenix district is

5    or isn't posted, do you?

6         A    No, I don't.

7         Q    You don't know whether in Phoenix there

8    have been folks in the Phoenix district, whether there

9    have been criminal defendants in Lake Havasu or in

10   Prescott that have been under electronic home

11   monitoring, do you?

12        A    I do not.

13        Q    You don't know, based on your

14   experience, whether electronic home monitoring would

15   somehow be ineffective other than your concern that a

16   defendant might have a two hour head start on a

17   pretrial services officer?

18        A    And based on my experience, that's two

19   hours, if everything falls exactly right when the call

20   goes off.  And having been out in the area and seen

21   Mr. Armstrong's proximity to the airport, if he had a

22   two hour head start, that would certainly be more than

23   enough for him to flee, if he so desired.

24        Q    Well, we're back to steal the plane or

25   get the confederate or whatever, right?

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 6.E.

83

1     A     You know, wouldn't necessarily have to

2     be a confederate, if you were broaching the subject of

3     a conspiracy, if you go up to somebody and say, Hey, I

4     just need a ride, and they have no idea you're a

5     fugitive, then that person wouldn't be doing anything

6     nefarious or illegal, and maybe he just said, Hey, I

7     need a ride.

8     Q     Do you have any knowledge that there is

9     anybody near Prescott or Lake Havasu, Arizona,

10    specific identified person or persons that Mr.

11    Armstrong has a relationship with that might aid and

12    abet his fleeing the jurisdiction?

13    A     There's one gentleman in particular that

14    I could name, and there are a great many people, as

15    you pointed out, that views are widely held, and there

16    are a great many people who would be sympathetic to

17    people in Mr. Armstrong's circumstance.  But there is

18    a gentleman, I believe, Bernard Presbaluski (phonetic),

19    and I probably butchered that name, who has a

20    business, business jet professionals in Prescott,

21    Arizona, and Mr. Presbaluski was also the gentleman

22    that recorded the quitclaim deed transferring the

23    Jones Drive property to Lake Havasu, and he also

24    appears to be involved heavily in the OID program.  So

25    there's one like-minded individual who at least has a

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.

```
 1    connection to some sort of jet business in Prescott,

 2    and I'm sure there are others.

 3         Q      And what knowledge do you have that Mr.

 4    Presbaluski or any other tax people, for lack of a

 5    better phrase, would engage in a separate federal

 6    offense of aiding and abetting unlawful flight to

 7    avoid prosecution?

 8         A      Mr. Presbaluski has posted on his door a

 9    document indicating that he believes he is sovereign

10    from the authority of the United States Government.

11    And I've read entirely too many such documents that

12    basically indicate where people say, hey, the laws of

13    the United States simply do not apply to me because

14    I'm sovereign.  So --

15         Q      And is espousing those views, or

16    contrary and legal views, in and of itself a criminal

17    violation that you're aware of?

18         A      No, but it certainly is an indication

19    that he would -- I'm not saying that he's committed a

20    crime, but if you're going to have somebody who might

21    help Mr. Armstrong get out of the country, it

22    certainly would be somebody -- he would certainly fit

23    the bill.  I don't believe -- if he did that, I

24    believe that Mr. Presbaluski would not believe that he

25    had done anything wrong and would probably believe
```

"ACCEPTED"
Richard Kelloff Armstrong
DECEMBER 10, 2013 ℃.

85

```
 1    that he had committed a heroic act.

 2           Q     But you are not suggesting that the

 3    exercise of one's First Amendment rights criticize the

 4    government or to articulate a contrary view is prima

 5    facie evidence that this Court should consider that

 6    this man is a risk of flight, do you?  Is that your

 7    testimony under oath?

 8           A     I'm not really sure how to broach it.

 9    But when somebody espouses that they're sovereign and

10    they're not subject to the laws of the United States,

11    then I certainly believe it would be an indicator that

12    they'd be inclined to either break or ignore them.

13           Q     And other than this speculation, and we

14    can talk about history some other time, do you have

15    any knowledge that Mr. Presbaluski or anybody else

16    would, in fact, willingly aid and abet?

17           A     I can't tell you the future, counselor.

18    I really can't.  But there are certain things that you

19    would say, you know, this might happen; but as far as

20    what's going to happen, I can't even necessarily tell

21    you the sun's going to come up tomorrow.  I'll wait

22    and see, but I don't know.

23           Q     All right.  Fair enough.

24           MR. KORNFELD:  With that, I'll pass the

25    witness.  Thank you.
```

*"ACCEPTED"*
*Richard Kellogg Armstrong*
*December 10, 2013 C.E.*

```
 1                THE COURT:  Redirect.

 2                    REDIRECT EXAMINATION

 3   BY MR. HARMON:

 4        Q     I just had one question, Agent.  It's

 5   based on what you said in cross-examination just a

 6   couple of minutes ago.

 7                You made a reference to proximity of one

 8   of Mr. Armstrong's Arizona residences to an airport.

 9   Can you clarify that for us, what residence and what

10   airport?

11        A     Mr. Armstrong has a residence at 30

12   Perkins Drive in Prescott, Arizona, and it's about

13   five minutes from a fairly large airport that has

14   numerous planes of Mr. Armstrong's type.

15        Q     Thank you.

16                THE COURT:  May this witness be

17   excused?

18                MR. KORNFELD:  Yes.

19                MR. HARMON:  Yes, your Honor.

20                THE COURT:  All right.  You're excused,

21   sir.  Any further witnesses?

22                MR. HARMON:  None from the government.

23                THE COURT:  Mr. Kornfeld.

24                MR. KORNFELD:  No, your Honor.

25                THE COURT:  All right.  I'm prepared for
```

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.
87

```
 1    argument, then.

 2                 MR. HARMON:  I'm defending the order, so

 3    I'm not sure if you want me to go first or second.  I

 4    don't care.

 5                 THE COURT:  Well, that's true.

 6                 MR. KORNFELD:  I'm happy to go first.  I

 7    think Mr. Harmon's right (unclear.)

 8                 Your Honor, with due respect to the

 9    agent, I think much of what we've heard today is rank

10    speculation, supposition.  You learn something new

11    every day.  I've heard people today in the abstract,

12    indicia of criminal activity expressing First

13    Amendment views, unpopular views.  I've heard that one

14    can freely fly across U.S. borders in the post 9/11

15    world.  I've heard that you possibly can rent an

16    airplane without a valid pilot's license, and we've

17    heard all kinds of rank speculation.  And I understand

18    and appreciate that the agent, based on his

19    investigation, has opinions and supposition, and maybe

20    at some point it might rise to the level of

21    circumstantial evidence as to guilt or innocence of

22    the indicted charges.  But drawing back to what the

23    issues are, the issue is whether there are conditions

24    or combination of conditions that will reasonably

25    ensure, as the agent said at the very end, we can't
```

*"ACCEPTED"*

*Richard Kellogg Armstrong*

*DECEMBER 10, 2013 C.E.*

```
 1    look into the future, we can't guarantee, and I don't
 2    need to lecture the Court on what the statute means.
 3    3142.  The Court deals with it much more often on a
 4    daily basis than I do.
 5              But with all that said, what we have
 6    here is, yes, we have serious criminal charges, they
 7    are fraud based charges.  There is money moving back
 8    and forth, but you heard no evidence that the majority
 9    of the money moving back and forth was moving through
10    accounts controlled by this man.  In fact, there was
11    money flowing to him, and then there's another
12    supposition, well, how does a retired guy make any
13    money.  There's lines of credit, there's investments.
14    People when they retire don't stop taking in funds.
15    They have to live.  So the mere fact that money is
16    going back and forth, you heard where the majority of
17    the money went.  Part of the money went to purchase
18    the plane, which is now subject to forfeiture, and
19    part of the money went to apparently pay off a house
20    or a property, but the bottom line is what you didn't
21    hear.  What you didn't hear is that this defendant
22    controls offshore funds, or that this defendant has
23    access to significant funds in the United States and,
24    in fact, he doesn't.  He filled out a CJA affidavit.
25    He was appointed CJA counsel, and other than, you
```

"ACCEPTED"
*Richard Kellogg Armstrong*
DECEMBER 10, 2013 C.E.

89

1   know, sort of the mud of people transferring money

2   back and forth, the bottom line is the government

3   knows where a lot of that money went.  And while the

4   government doesn't know where some of that money is,

5   there's been no evidence that that money is available

6   to this defendant, that money can aid and abet this

7   defendant in fleeing.

8            You've also heard a bunch of stuff about

9   the airplane, but I would suggest that by virtue of

10   surrendering a pilot's license, and with it, by the

11   way, comes you don't have your health credentials

12   either, there's no one that's going to rent an

13   airplane to somebody who's 76 with no license and no

14   FAA health certification.  You have to have both, and

15   he will have neither, if he gives them up.  He doesn't

16   have a plane because the plane is under government

17   control, and so sort of all this what if and what if

18   Mister, whatever his name is, from the whatever, what

19   if he, who doesn't like the government, goes and helps

20   him and confederates, I mean, we're 14, 15, 16 stages

21   of what if.

22            I would respectfully suggest to the

23   Court that the defendant can be -- either the Court

24   can fashion a condition or combination of conditions

25   to and including the following:  No. 1.  A curfew.

"ACCEPTED"
Robert I Kellogg Armstrong
DECEMBER 10, 2013 CE.

90

```
 1    No. 2.  Electronic -- a curfew, however it wants to
 2    be established.  In other words, by phone calls, in
 3    addition to No. 2, electronic home monitoring.  No.
 4    3.  Surrendering the passport.  No. 4.  Surrendering
 5    the pilot's license.  No. 5.  The Court can even
 6    restrict this defendant's movement to disallow him
 7    leaving his primary residence in Prescott other than
 8    for necessity, groceries, medical, legal, coming to
 9    court in Colorado, coming to meet with me.  I don't
10    need to sit here and speculate as to all of the
11    potential things the Court can do, but what you have
12    is a white collar case with a 76 year old man with no
13    prior criminal history, not so much as a DUI.  No
14    evidence of his inability to be monitored or to comply
15    with probation or pretrial.  No evidence that his
16    inability to respect government supervision or court
17    supervision.
18              There's some suggestion that by virtue
19    of not carrying his form in his airplane, that he is
20    somehow not amenable to following the rules and
21    regulations.  I would respectfully suggest that that's
22    a stretch.  There is nothing.  If you walk this earth
23    for 76 years and this Pretrial Service Report comes
24    off as clean as this one does, I would respectfully
25    suggest that we have established by the lack of bad
```

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C E,

91

1    stuff in here that he is amenable to supervision, that

2    he is respectful of the laws of this country, that

3    whether or not he believes the United States is a

4    sovereign nation or has any kind of claim over him,

5    the fact remains he has filed his income taxes.

6    You've heard that he has.  The corporate entities have

7    filed income taxes.  You've heard that they have.  And

8    it just seems to me, given the expected length of this

9    case, the defendant's age, the concerns about his

10   ongoing health in the future and the need to have

11   access to his family and his support system, both for

12   the bereavement piece and also to help me with his

13   defense, that there is a condition or frankly a

14   combination of conditions that the Court could

15   impose.

16          We are open for the ones I articulated.

17   We are open to others.  We will do whatever we need to

18   do and will be on whatever short leash this Court

19   believes is necessary in order to get this man home

20   during the pendency of this case.

21          Thank you, your Honor.

22          THE COURT:  Mr. Harmon.

23          MR. HARMON:  I'll try to be brief, your

24   Honor.  I'm defending an order that the preponderance

25   of the evidence establishes defendant's a flight

"ACCEPTED"

*Richard Kelly Armstrong*

*DECEMBER 10, 2013 C.E.*

92

1    risk.  Nothing you heard today from the defense

2    changes that.  In fact, what you have from the defense

3    is the cross-examination and the proffer of defense

4    counsel on behalf of the defendant, as well as this

5    Pretrial Services Report.  I think I'd like to start

6    there, because Mr. Kornfeld points to it as being

7    something that's supportive of his client's position

8    saying it's a clean report.  Well, I looked at it, and

9    I wasn't surprised why it was clean, because it seemed

10   to have a lot of things that were omitted or

11   inconsistent.

12            There's nothing in here, for example,

13   about the Cabo San Lucas residence, and that may be

14   because what the defendant's telling you right now

15   today in the District of Colorado may be true.  Maybe

16   it's the case that he just every single year for the

17   last 25 years he rents a property seasonally and we

18   don't know if it's the same property or not, and maybe

19   it's true that he's saying that he doesn't legally own

20   it, or maybe it's true what he says to his lender when

21   he buys an airplane, a Cessna airplane, that he owns

22   the property a hundred percent and he's going to

23   probably own the Cabo San Lucas for a long time.  We

24   don't know.  And that's what the Court's being given

25   to make a decision about the defendant.

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.

93

```
 1              We also don't know about Prescott,
 2    Arizona.  There was nothing in here about his
 3    Prescott, Arizona residence, although that appears to
 4    be the place where he last flew into and where he was
 5    staying right before he left to go back to Cabo San
 6    Lucas and then come back to the United States.
 7              And then we don't know about his
 8    employment, either.  I mean, he says that he's retired,
 9    in the Pretrial Services Report, and that's consistent
10    with what he told the FAA.  It's not consistent,
11    however, with what he tells lenders and other people.
12    He tells them he's a general manager of something
13    called Bonanza Pacific, which I guess is a Canadian
14    foreign entity.
15              So I don't know who you're supposed to
16    believe on that.  Do you believe the defendant in
17    court, the defendant in some of these pronouncements
18    to government agencies, or do you believe him when
19    he's talking to his lawyer.  So the bottom line is
20    there's basic things about the defendant you just
21    don't know.  They change, depending on the audience.
22    They change, depending on whether it's convenient or
23    not.  It was very convenient for this defendant to
24    omit any part of this report that he had any
25    connections in Cabo San Lucas.  And so that was one of
```

"ACCEPTED",
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.

94

```
 1    the reasons I gave the Court a Grand Jury exhibit --

 2    excuse me, Grand Jury exhibit, Government Exhibit 2.

 3              A picture tells a thousand words, and

 4    there's a picture in here of a happy couple together

 5    on a website for a real estate business.  I think it

 6    shows you that there's some significant ties and

 7    interest and inclination to be in Cabo San Lucas

 8    whether you're renting or leasing long-term or you're

 9    owning.  Whichever it is, it shows the disposition to

10    be in another place and not the United States.  The

11    defendant does have the financial wherewithal to flee

12    and to stay abroad if he wants.

13              The Court heard the testimony from Agent

14    Flynn that there is $600,000 that hasn't been

15    accounted for.  He's traced at least $400,000 of that

16    to entities that are offshore.  Mr. Kornfeld says,

17    well, there's nothing definitely proving that he's got

18    foreign accounts.  Well, that's the whole point of

19    having foreign accounts.  It makes it difficult to

20    actually find the accounts, but you've got great

21    circumstantial evidence that the defendant benefits

22    from these foreign entities because he gets (unclear)

23    periodic payments back from these foreign entities

24    into his domestic accounts.  So that's the inference

25    you have that he has money to live on that's foreign
```

"ACCEPTED "
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E,

1    based.  And so the only thing that really needs to be

2    changed in these findings is the finding that's (a)(5)

3    on page 3 that it was in excess of a million.  I'll

4    say the government has presented evidence of in excess

5    of 400,000, but that really doesn't change the

6    analysis of commitment.

7              The other thing I do want to point out

8    that has not been directly drawn out in the testimony,

9    but it's something that Mr. Kornfeld alluded to is it

10   is a serious crime, and it's a serious crime for

11   somebody in the twilight of their life, a 76 year old

12   man.

13             The evidence is that the fraud, the

14   attempted fraud here involved $3 million.  And if a

15   court finds the defendant guilty and follows the

16   sentencing guideline range that would be calculated,

17   I think you're talking of taking a look at a 70- to

18   71-month sentence.  Not a trifling range for a man of

19   that age.  So there's a great motive, if you believe

20   that the government has a substantial case.

21             I'd submit if you look at the Criminal

22   Complaint in that Affidavit, it's a substantial case.

23   So you've got a substantial case, a very severe

24   penalty, wherewithal to travel internationally, ties

25   to another country, the ability to get in an airplane

"ACCEPTED"

*Richard I Kellogg Armstrong*

DECEMBER 10, 2013 C.E.

1    and go.

2                    Now, Mr. Kornfeld posits that it's going

3    to be very difficult if he doesn't have a pilot's

4    license to be able to do that on his own, and I'll

5    grant it.  But we all know, and I think it's

6    conventional wisdom these days that if you want, you

7    want to get into the country from Mexico, it's pretty

8    easy.  Despite all of the law enforcement apparatus we

9    have to prevent that, you want to get out of the

10   country to go back to Mexico, it's even easier, and I

11   don't think there are any conditions that would

12   prevent a defendant that's inclined to make his way

13   back across the boarder.  I'm troubled that if the

14   defendant were released on bond, he would have a

15   legitimate right and interest to travel frequently to

16   the state of Colorado.  And if he doesn't get in a

17   car, I mean if he doesn't get in an airplane, he's

18   going to get in a car.  There is nothing preventing

19   him from getting in that car and turning in the wrong

20   direction and going south, whether it's an airplane or

21   a car.  I know the borders require you these days to

22   have passports and things like that, but there's

23   nothing stopping people with ingenuity of

24   circumventing it.  That's just the reality of the

25   security or lack of security of our borders.

*"ACCEPTED"*
*Richard I Kellogg Armstrong*
*DECEMBER 10, 2013 C.E.*

97

```
 1              So, you know, I'll close at this point.
 2    At the risk of reiterating, I'll stop and say,
 3    basically, I think this order is still well-founded,
 4    and I think the defendant hasn't basically overcome
 5    these findings, and the conditions he posits really
 6    aren't sufficient to avoid the realistic danger and
 7    probability that he wouldn't flee.
 8              THE COURT:  Mr. Kornfeld, I'll give you
 9    a last statement, if you want one.
10              MR. KORNFELD:  Well, I think the Court's
11    been indulgent already.  So, no.
12              THE COURT:  All right.  Looking at the
13    record as a whole, what I find from the testimony,
14    whether it was on direct or cross, is a complicated
15    series of cash transfers that involve the multiple use
16    of corporations, different kind of corporations'
17    names, so many that I can't even track them all;
18    different banking institutions in Belize, Mexico,
19    Germany.  There's even some, a trust in Canada, I
20    believe; many things that are contradictory in nature
21    about what the defendant is doing; different things in
22    loan applications that there were in what he now tells
23    us; all kinds of property here and there.  Basically,
24    it's a confusing array of money.  And to me what that
25    shows is the intellect to engage in complicated
```

*"ACCEPTED"*

*Richard Kellogg Armstrong*

*DECEMBER 30, 2013 C., E.*

1    transactions in a manner to make it very hard to trace

2    money, to find money, and would also make it very hard

3    to trace and find this person, if that person did not

4    want to be found.

5              The evidence is clear, contrary to what

6    defense argues, that Mr. Armstrong has control of

7    money overseas.  I don't know how much.  I don't know

8    everywhere, but he's getting money in.  He's got

9    control of it.  He's getting money out, getting money

10   in.  Somehow or other he's got control, and there's a

11   lot of money that's still missing that is unaccounted

12   for that has been traced as far as to get it offshore,

13   and I think that's very, very troubling because it

14   means you have assets defining life in another place.

15             I'm not as concerned about the pilot

16   ability because the pilot's license has been seized,

17   and anyone currently has a way to cross the boarder.

18   You don't need a pilot's license to run away, if

19   you're intent on doing it, but what you do need is

20   the smarts to get it done and the money to make it

21   possible.

22             So in this regard, I find that the

23   defendant has access to substantial assets overseas,

24   the intelligence and the cunning to figure out what

25   to do if he needs to get it done, and the foreign

*"ACCEPTED"*

*Richard Kellog Jm Strong*

*Distribution 10, 2013 CE.*

1    connections that are very troubling and give him

2    access to a place to go outside of this country.  I

3    think that all I've heard that is in any way changed

4    from what Judge Lewis heard is that I think I probably

5    heard more that makes me very, very, very concerned.

6    And I find at this point that this defendant is a

7    substantial flight risk, and I find that by a

8    preponderance of the evidence.

9              I agree with Judge Lewis's Order of

10   Detention, and I find that there are no conditions or

11   combinations of conditions which would reasonably

12   ensure the presence of the defendant as required by

13   the Court, and I'm going to order that he be detained

14   without bond pending all further proceedings.  I do

15   not find that he is a risk of safety or danger to the

16   community or others.  My findings are based on only

17   flight risk.  Anything further?

18              MR. HARMON:  No thank you, your Honor.

19              THE COURT:  Mr. Kornfeld?

20              MR. KORNFELD:  No, your Honor.  I

21   understand your order.

22              THE COURT:  All right.  We're going to

23   be in recess on this matter while the marshals get the

24   other two defendants that need to be brought in.

25   People on the civil case, I'm sorry, but the criminal

"ACCEPTED"

Richard Kellogg Armstrong

DECEMBER 10, 2013 C.E.

100

```
 1    matters have to come first because the marshals have

 2    to get the people back where they belong.  So I've got

 3    to do those before I do yours, and I don't know how

 4    long they'll be, but we'll be in recess for five to

 5    ten minutes, just so long as we --

 6                    MR. KORNFELD:  May I ask one question,

 7    your Honor.  Because it's after five-thirty, the Court

 8    had directed us to Judge Blackburn.  May we contact

 9    Chambers tomorrow?

10                    THE COURT:  I think that would be wise.

11    They're probably not there.

12                    MR. KORNFELD:  That's my thought.

13                    THE COURT:  But they might be.  You

14    never know.  I think tomorrow is fine.

15                    MR. HARMON:  I don't think Ms. Williams

16    is here, in any event, so we'll arrange with her.

17                    THE COURT:  All right.

18        (Recess taken at 5:28 p.m.)

19                        *   *   *   *   *

20

21

22

23

24

25
```

"ACCEPTED"
Richard Kellogg Armstrong
DECEMBER 10, 2013 C.E.

101

```
 1                    CERTIFICATE

 2          I certify that the foregoing is a

 3   correct transcript to the best of my knowledge and

 4   belief (pursuant to the quality of the recording)

 5   from the record of proceedings in the above-entitled

 6   matter.

 7        Dated this 17th day of July, 2010.

 8

 9

10          /s/Adrienne Whitlow

11        8000 E. Girard Ave., #109
            Denver, CO  80231
12           (303) 695-1121

13

14

15

16

17

18

19

20

21

22

23

24

25
```